PARKER, *Appellant* v. ROBERTS, *et al.*

Division One, June 19, 1893.

1. **Fraud:** CREDITORS.—Creditors of a person defrauded cannot assail such fraud even though its effect is to diminish the debtor's ability to pay them.

2. **Fraudulent Conveyance:** CREDITORS.—The statute against fraudulent conveyances is directed against the acts of the grantor committed with the intent to hinder, delay or defraud creditors and not to the acts of the grantee in fraudulently inducing the grantor to make the conveyance.

3. **Chattel Mortgage:** MORTGAGEE AS PURCHASER.—The mortgagee may purchase at a sale under a chattel mortgage.

4. **Supreme Court Practice:** EQUITY CASE: REVIEW OF FINDING OF FACTS.—While the conclusions of fact drawn by the trial court from the evidence in an equity case are not regarded by the supreme court as conclusive but will be reviewed and reversed if deemed erroneous, yet much deference is accorded such findings on account of the superior advantages the trial court possesses for weighing the evidence and for determining the credibility of the witnesses.

*Appeal from Buchanan Circuit Court.*—HON. HENRY M. RAMEY, Judge.

AFFIRMED.

*Reed, James & Randolph* for appellant.

(1) The personal judgment against Abbott rendered by the Harrison circuit court in Kentucky, 1875, was not barred when sued upon, May, 1888, in the

Buchanan circuit court, Revised Statutes, Missouri, 1889, sec. 6796. (2) The plaintiff's judgment May 19, 1889, was a valid judgment of a court of general jurisdiction, and cannot be assailed collaterally. (3) Abbott being insolvent and having no property available on execution, plaintiff, a judgment creditor, is allowed to bring his bill to remove incumbrances without execution and return, *nulla bona*; there being no adequate remedy at law. *Merry v. Freemon*, 44 Mo. 521; *Turner v. Adams*, 46 Mo. 99; *Humphreys v. Milling Co.*, 98 Mo. 548. (4) The mortgage executed for the purpose of hindering and delaying plaintiff in the collection of his claim, was fraudulent and void. (5) The mortgage executed for the benefit of the mortgagor's family and for the purpose of "hindering and delaying the mortgagor's creditors, is void as to such creditors, although it secures a valid debt, and was made with the purpose, in part, of securing such debt in good faith." *Manufacturing Co. v. Steele*, 36 Mo. App. 496; *Nasse v. Algermissen*, 25 Mo. App. 186.

*Rush & Rush* for respondents.

(1) The mortgage was given to secure a *bona fide* indebtedness from Abbott to Roberts upon a settlement of their partnership. If Abbott was over-reached in his settlement of the partnership, it would be a matter of which Abbott or his representative could complain, but Abbott's creditors cannot bring suit to have the settlement set aside. *Colbern v. Robinson*, 80 Mo. 541; Bump on Fraudulent Conveyance [2 Ed.], pages 17 and 18; *Eaton v. Perry*, 29 Mo. 96 *loc cit.* 97, 98. (2) There must be an actual intent upon the part of the insolvent and that intent must be joined in by the defendant to cheat and defraud creditors, before conveyance will be set aside the instance of creditors. *Colbern v. Robinson*,

*supra*, pages 546 and 547. (3) Abbott being a party to the chattel mortgage, his testimony, in order to be made the basis of a decree, should be consistent, clear and convincing. *Colbern v. Robinson, supra*, page 546. (4) If the actual value of the property was less than the amount due upon the note at the time of the private sale by Roberts, it is immaterial that Roberts was in fact the purchaser if he took it in satisfaction of the debt. 3 American and English Encyclopedia of Law, page 206, section 19, and cases cited in note.

MACFARLANE, J.—This is a suit in equity to set aside, for alleged fraud, a certain chattel mortgage, executed September 27, 1887, upon a lot of horses and wagons, made by one W. W. Abbott, deceased, to defendant Roberts, to secure a note for $6,887.73. Defendant Driver is the administrator of the said Abbott. The suit is prosecuted by the plaintiff, who obtained a judgment in the circuit court of Buchanan county against Abbott on the nineteenth day of May, 1888, for the sum of $3,400. The judgment was obtained upon the transcript of a judgment of a court of record in the state of Kentucky, rendered in the year 1875 in favor of one B. F. Pullen, and assigned to plaintiff.

Plaintiff charged that the judgment was unpaid and since its rendition the said Abbott nor his estate had any property out of which the same could be collected by process of law; that all the property Abbott had was included in said mortgage to defendant Roberts; that at the date of the mortgage defendant Roberts, well knowing of the existence of said judgment, fraudulently conspired with said Abbott to cheat and defraud plaintiff and to hinder, delay and prevent him from collecting the same, made said chattel mortgage purporting to secure a note of $6,887.73,

which was wholly fictitious. He charged further that on the date of the mortgage said Abbott was suffering from cancer, and, while under the influence of opiates, and wholly incapable of transacting business, and not knowing what he was doing, the said defendant Roberts fraudulently induced him to execute the mortgage, with the fraudulent intent of defeating, hindering and delaying plaintiff in the collection of said debt; that after the said Abbott recovered from the influence of said opiates, with the fraudulent intent to hinder, delay and defraud, he ratified and affirmed his act in executing said mortgage and then conspired with said Roberts to carry out such fraudulent intents; that the property mortgaged was reasonably worth $18,000; that the mortgage was duly recorded the day after its execution; and that Roberts took possession of said property which he still retains; that after the date of said mortgage the said Roberts as mortgagee made a pretended sale of the property under the powers therein contained and fraudulently purchased it himself. The prayer was to set aside the mortgage and pretended sale and to require Roberts to account for said property and its increase and proceeds.

The following facts were undisputed. Abbott was a dealer in blooded horses in Kentucky and later moved to Missouri, dying in St. Joseph, January 8, 1889. When in Kentucky judgments were rendered against him. One in favor of Pullen, upon which plaintiff obtained his judgment as charged in the petition. Another was in favor of a man named Emerson. Prior to January 1, 1887, Abbott and Roberts had dealings by which the former was indebted to the latter in the sum of $2,630. On that day they entered into a partnership for the purpose of raising and dealing in fast horses, Abbott putting in his horse stock at an agreed valuation of $12,000, Roberts

putting in a stock farm. Abbott becoming unable to attend to the business, the partnership was dissolved in September, 1887, when a settlement was made by which Abbott took back the horses, etc., and gave Roberts a note and mortgage on the property for $6,887.73, the amount they agreed was due him. This is the note and mortgage which plaintiff seeks to set aside. The mortgage authorized a private sale of the property by the mortgagee. Afterwards Abbott gave Roberts written authority to sell the property at private sale, which he did, making sales to persons from whom he previously agreed to take it himself at the agreed prices; this he did. Part of the property he had sold and part he still retained.

The evidence tended to prove that the real value of the mortgaged property did· not exceed the debt secured. Under the sale made, the proceeds were insufficient to pay the amount due on the note.· After hearing the evidence the court found for defendant and dismissed the petition, and plaintiff appealed.

I. Much of the evidence offered by plaintiff, particularly that of Abbott himself, was in support of the theory that in the settlement of the partnership affairs, Abbott was suffering physically from disease, was under the influence of morphine, and in consequence was mentally incapable of transacting the business in hand, and was by reason of these disabilities overreached and defrauded by Roberts.

While we do not think the weight of the evidence bears out this theory, we are satisfied that the court altogether disregarded this evidence so far as it tended to prove a fraud perpetrated upon Abbott by Roberts in obtaining the note and mortgage, and the question is one of law whether creditors can take advantage of such fraud. It is very evident that the statute against fraudulent conveyances is directed against the acts of

the grantor done with the intent to hinder, delay or defraud creditors, and not to the acts of the grantee in fraudulently inducing the grantor to make the conveyance.

In *Eaton's Adm'r v. Perry*, 39 Mo. 96, it is said: "The defense of drunkenness, like that of infancy, duress, imbecility, etc., is a personal one, and if the party whose interest is affected by a contract made when drunk chooses to abide by it when sober, third persons are not permitted to interpose," citing *Cole v. Gibbons*, 3 P. Wms. 290. In *Colbern v. Robinson*, 80 Mo. 541, it is held that though a creditor is overreached and defrauded by another, the fact is not a matter of which the creditors could take advantage.

The rule is well settled elsewhere. "The creditors of a party defrauded have no right, even though the fraud has the effect to diminish his means of paying them, to look into such fraud or unravel it. It is for him and him alone to do so, and if he chooses to acquiesce in the fraud, or suffers himself to be concluded of his right to investigate or undo it, his creditors must be content to abide by the legal rights remaining in him. There is a manifest distinction between a fraud upon the debtor and a fraud upon creditors. In the one case the debtor is the victim and guilty of no wrong, while in the other he is himself either in fact or in law the perpetrator of the fraud. In the latter case the creditors who seek to avoid a sale or transfer do not represent the debtor, but exercise rights paramount to his. In the former case, the remedy belongs to the debtor alone, and they cannot interfere when they are not in the contemplation of the author of the wrong, and are only affected consequentially." Bump on Fraudulent Conveyances, 18; *Garretson v. Kane*, 27 N. J. L. 208; *Graham v. Railroad*, 102 U. S. 148, and other cases cited by Bump.

II. The question of fraud on the part of Abbott in the execution of the mortgage, and of the participation therein by Roberts, resolves itself into a question of fact. The legal principles involved are well settled. That Abbott had the right to secure the debt due to Roberts, to the exclusion of the judgment held by Parker, is settled by a long and unvarying line of decisions of this court, though no equities growing out of the partnership relation of the parties had existed. That Roberts had the right thus to secure himself, though he was advised that Abbott intended thereby to defeat the Parker debt, is equally well settled by the same authorities. Abbott testified to his own fraudulent intent, and thus, so far as he was concerned, fixed upon the transaction the stamp of fraud. The only remaining inquiry, therefore, is, whether Roberts was a participant in the fraudulent purposes of Abbott.

The evidence establishes quite conclusively that prior to the execution of the mortgage, Roberts had knowledge of the existence of the Parker debt. Indeed he admitted as much when examined as a witness, but that knowledge instead of tending to fix upon him fraud in taking the mortgage, afforded rather an inducement for wanting to secure his own debt. A deposition of Roberts was taken prior to the trial. On the trial from this deposition was read as embodying a declaration of Roberts the following question and answer thereto:

"*Q.* Was it not understood when Abbott signed that mortgage that after you were to be paid, the remainder was to go to Maria Morrow and John W. Abbott, his boy? *A.* Yes, sir, without any reference to the Pullen judgment."

It also appeared that in 1884, Abbott was indebted to Roberts to the amount of about $600, to secure which he then gave a chattel mortgage on some horses. A part

of said deposition in which Roberts testified to taking that mortgage was read and was as follows:

"*Q*. What other chattel mortgage, if any, had you ever taken from W. W. Abbott on his property? *A*. Sometime during the year previous to the New Orleans exposition, Abbott came to my office and remarked that there was an old judgment against him that was oppressing him; that he wished to secure me in the amount that he owed me at that time, which was $613.85, and that he wished to further mortgage his property to protect himself against this judgment. He gave me the note for $613.85, after signing them, and either one or two other notes he placed in the hands of John Donovan, Jr., to hold on account of not belonging to me, and as a subterfuge to protect his property from the Emerson judgment. I think that was it."

It was also shown that Roberts permitted Abbott to dispose of the property covered by this mortgage at his will and without reference to the mortgage debt. It also appeared that the old judgment referred to was one held by a man named Emerson and was settled before the mortgage in question was made. The evidence also showed that the property was sold by Roberts at private sale and was bought by persons who had an understanding with him before the sale that he would take the property back at the prices paid therefor. Defendant insisted that the participation of Roberts in the fraudulent purpose of Abbott is sufficiently shown by this evidence to demand the relief sought.

We do not think the declaration of Roberts to the effect that when the mortgage was taken there was an understanding with Abbott that after the secured debt was paid, the remainder of the proceeds of a sale should go to Maria Morrow and John W. Abbott, when taken in connection with the other evidence, shows an intent to withdraw this property from the claims of the

creditors.   In the first place, the declaration is coupled
with the further statement that no reference at that
time was had to the Pullen judgment which was
assigned to plaintiff.   Another declaration found in the
same deposition explains this one and must be taken
with it and the whole weighed together.   When asked
what the understanding was between himself and
Abbott, Roberts answered: "That the property was
to be closed out and his indebtedness to myself paid,
and after all the indebtedness was paid, the remainder
was to go to Maria Morrow and John W. Abbott, his
boy."   On the trial Roberts was recalled by the court
and asked whether there was any agreement between
himself and Abbott as to what should become of the
proceeds of the property in excess of what was neces-
sary to pay the debt secured, and he answered that
there was none.   Abbott, himself, testified: "I said I
just wanted Mr. Roberts to hold this property to keep
them, the creditors, from getting hold of this prop-
erty, till I could get upon my feet and sell stock enough
to pay this debt, to pay the Parker debt."   Now this
evidence is wholly inconsistent with the idea that the
property after the Roberts debt was paid, should be
concealed for the use of Maria Morrow and John W.
Abbott.

Another undisputed fact in evidence, wholly incon-
sistent with this theory of an intent to put the property
out of reach of creditors is that, on the day after the
execution of the mortgage, the parties agreed in writing
that the partnership should be continued "when said
W. W. Abbott recovers from his present sickness
sufficiently to enable him to perform the duties and
covenants prescribed for him in said article of co-part-
nership."

As to the mortgage of 1886, while Roberts admits
that he knew that fictititous debts were included, he testi-

fied that he refused to take charge of the notes evidencing such debts and had nothing to do with them. It also appeared that Roberts paid off for Abbott the only debt mentioned in connection with this fraudulent mortgage. But, even assuming that Roberts advised and assisted in this attempted fraud, it was three years before the transaction in question, and had no connection with the mortgage which is attacked here, and the evidence, at least, was only admissible as a circumstance to show the previous dealings of the parties for the purpose of throwing light upon the one under consideration. Taken alone, that transaction establishes no issue in this case.

The irregularity of the sale under the mortgage may afford grounds for avoiding the sale and for allowing a redemption by the administrator of Abbott, but it suggests no reason for avoiding the mortgage altogether. The authority given the mortgagee to sell at private sale was a provision contained in the mortgage itself, the only condition being that the mortgagor should have notice thereof. If Roberts in making the sale violated the trust and confidence reposed in him by Abbott, he is accountable therefor to Abbott, and his legal representatives. The fraud in such case was that of Roberts and not of Abbott, and was one of which, as has been seen, the creditors cannot complain. "A mortgage of personal property does not fall within the principle which forbids a trustee from purchasing at his own sale; if he does, the burden is on him to show the fairness of his own sale. The mortgagee of a chattel may purchase at a sale under the mortgage. Such a purchase is valid, and is voidable only in equity at the election of the parties interested." Herman on Chattel Mortgages, 514, sec. 219. "The mortgagee himself may purchase the chattel at a fair sale under the power contained in the mortgage. Such

purchase is good at law, and if voidable in equity, it would only be so for unfair dealing, and only at the instance of interested parties." 3 American and English Encyclopedia of Law, 206, section 19, and cases cited.

III. It is the well settled rule of practice in this court in equity cases that while the conclusions of fact drawn by the trial court from the evidence are not taken as conclusive, but will be reviewed and reversed if thought to be erroneous, still much deference is given to their findings on account of the superior advantages they possess for weighing the evidence and judging of the credibility of the witnesses. *Mathias v. O'Neill*, 94 Mo. 523 and cases cited; *McElroy v. Maxwell*, 101 Mo. 295. The evidence in this case was conflicting and justified the conclusion reached by the court, and we see no reason for disturbing its judgment, and it is affirmed. All concur.