STEVENSON et al., Appellants, v. SMITH et al.

Division One, June 15, 1905.

1. **EVIDENCE: Statute of Another State: Common Law.** Where the statutes of Illinois concerning dower and descent are not introduced in evidence to show what interest the widow of an intestate who died there took in his estate, the common law will be assumed to be in force there, in passing upon that point.

2. ————: **Resulting Trust: Burden.** The burden is on plaintiff to show that certain money with which the advance payment on the purchase of a farm was made, was made with a part of a trust fund which belonged to plaintiff's mother and the grantee to whom the deed was made. But where the grantee by his defenses admits, by way of confession and avoidance, that the

trust fund existed, the burden is on him to show that he afterwards paid back to her her share of the trust fund before the deed was made to him, in consideration of which she released all further claim in the land.

3. RESULTING TRUST: Future Settlement. The evidence established that a mother invested $1,500 in a farm, the title to which was taken in her son, the defendant; that afterwards, she spent much money for a wayward son, and that defendant did also, and he claims that her interest in the farm was wiped out by money advanced to her on that and other accounts, and relinquished to him. Subsequently she lived on the farm and it was assessed to her and he spoke of it as her home and as her place, and he aided the assessor to value it, knowing it was being assessed to her, and when she asked him for a deed he evaded giving it, and when it was mortgaged he alone executed the deed of trust, and she stood by, and the reason why he alone made it was explained to her. Their farming venture failed, and she thereafter lived at defendant's house, and often stated that she was broken up, and when she died defendant paid all the expenses. *Held*, that the burden being on defendant, he has not satisfactorily shown that her share in the farm was repaid to her.

4. ———: Adjustment: Mortgage: Liens. Where land is purchased by one in his own name with money of another, a resulting trust is created by implication of law, which follows the ownership of the money. And where a part only of the purchase money is furnished by the beneficiary, the trust is for a proportionate share of the land bought.

5. ———: Limitations: To Be Pleaded. The Statute of Limitations, if relied on as a defense, must be pleaded, in perhaps all cases except ejectment suits.

6. ———: Laches: Pleading. It is not necessary in order to take advantage of the defense of laches that laches be pleaded. If it appears at the hearing that the case is liable to that objection the court will remain passive and refuse relief and decline to entertain the suit.

7. ———: ———: How Determinable. There is no rigid rule for determining the question of laches. Laches is a question of fact on the evidence, determinable upon the particular facts and circumstances of each case.

8. ———: ———: Dealing With Mother. Courts should not be disposed to apply laches to the dealings of an old mother with her confidential business manager, a son, with whom she resided and on whom she depended, and should not do so except in a pronounced and unequivocal case; and if it cannot be ap-

.plied to the mother, it should not be applied to her heirs who after her death bring timely suit to establish a resulting trust in land which had in part been bought with the mother's money.

9. ———: **Partition.** Where heirs have established a resulting trust in favor of their deceased mother in land, and it appears that defendant paid her funeral and other expenses, partition and distribution should·await an administration upon her estate, because their interests are subject to the payment of her debts.

Appeal from Linn Circuit Court.—*Hon. Jno. P. Butler,* Judge.

REVERSED AND REMANDED (*with directions*).

*West & Bresnehen* for appellants.

(1) Where land is purchased by one in his own name, with the money of another, a resulting trust is created by application of law, which follows the ownership of the money. And where a part only of the purchase money is furnished by the beneficiary, the trust is for a proportionate share of the land bought. Richardson v. Champion, 143 Mo. 538; Rice v. Shipley, 159 Mo. 899; Crawford v. Jones, 163 Mo. 577; Jones v. Elkins, 143 Mo. 647; Bowen v. McKean, 82 Mo. 594; In re Ferguson's Estate, 124 Mo. 574. Applying this doctrine to the undisputed facts of this case, it conclusively appears that the judgment of the lower court is wrong and that it must be reversed. (2) There is no evidence to support the defendant's allegation that the interest of his mother in the 240 acres of land bought was "only a dower interest therein for and during her natural life." In the absence of such proof, and under the facts of this case, the law itself fixes her interest at one-half .of the land bought, not for life, but in fee. The allegation in defendant's answer that his mother was to have a life estate only, in one-half of the land, is wholly unsupported by the evidence, and is in conflict with the established principles of equity. (3) The evidence

Vol 189 mo—29

abundantly shows that each of the parties was entitled to one-half of the 240 acres of land, and the north 120 acres was recognized as the property of Rebecca Smith, and the south 120 as the property of the defendant, William Smith. This amounted to a verbal partition of the land.

*E. R. Stephens* and *A. W. Mullins* for respondents.

(1) Although the conclusions of fact drawn by the trial court from the evidence in an equity case are not regarded by this court as conclusive, but subject to review, yet much deference is accorded such findings on account of the superior advantages the trial court possesses for weighing the evidence and judging of the credibility of the witnesses. Parker v. Roberts, 116 Mo. 667; Mathias v. O'Neill, 94 Mo. 529; Chouteau v. Allen, 70 Mo. 290; Sharp v. McPike, 62 Mo. 307; Dunivan v. Dunivan, 157 Mo. 157. (2) The evidence in this case did not support the plaintiffs' petition and was insufficient to authorize a decree for plaintiffs thereon. "The rule which prevails in this State, the general rule elsewhere upon the subject of resulting trusts, requires that in order to prove such a trust it must be established by testimony so clear, strong and unequivocal as to banish every reasonable doubt from the mind of the chancellor respecting the existence of such trust." Burdett v. May, 100 Mo. 13; Forrester v. Scoville, 51 Mo. 268; Ringo v. Richardson, 53 Mo. 385; Kennedy v. Kennedy, 57 Mo. 73; Philpot v. Penn, 91 Mo. 38; Dunivan v. Dunivan, 157 Mo. 157; 1 Greenl. on Evidence, sec. 200. (3) The defendant, William Smith, purchased the 240 acres of land described in the pleadings, from James O. Crandall, on May 29, 1884, and, it appears, paid on the purchase at that time, $450 in cash. This was his own money. There is not a particle of evidence to the contrary. Afterwards the Illinois land was sold, in which the widow, Rebecca Smith, had a dower interest. Then the defendant William Smith received from his mother

$,1,500, her dower money, and used that in part payment for said 240 acres of land; but before Crandall and wife deeded the land to William Smith, he had paid back to his mother the amount of said $1,500, and had in addition thereto furnished her considerable more money. We think the evidence shows this. When the deed to William Smith was executed by Crandall and wife, the widow, Rebecca Smith, was present and understood the transaction and was satisfied with it. There was no resulting trust created by that conveyance in favor of Rebecca Smith. "The trust must result, if at all, at the instant the deed is taken, and the legal title vests in the grantee. No oral agreements and no payments, before or after the title is taken, will create a resulting trust, unless the transaction is such at the moment the title passes that a trust will result from the transaction itself." 1 Perry on Trusts (3 Ed.), sec. 133 and note 3; 15 Am. and Eng. Ency. Law (2 Ed.), 1137; Richardson v. Champion, 143 Mo. 544; Sell v. West, 125 Mo. 631. (4) The lapse of time and great delay on the part of the plaintiffs and Mrs. Smith, under whom they claim as heirs at law, in seeking to enforce the alleged trust against William Smith, the defendant, should of itself preclude the plaintiffs from recovering. Bliss v. Prichard, 67 Mo. 181; Burdett v. May, 100 Mo. 13; Reed v. Painter, 145 Mo. 341; Landis v. Saxton, 105 Mo. 486.

LAMM, J.—Rebecca Smith died intestate in October, 1901, in Linn county, owning no property in her own name and leaving the respondent William Smith, a son, and certain other sons and daughters, and the descendants of those dead, her only heirs at law. Certain of her surviving children, together with certain of her adult grandchildren, and certain minors of the same blood kin through their curator, brought this suit in August, 1902, against William Smith and certain minor non-resident grandchildren, and one Jackson Fyke and

one J. C. Meacham, the object and general nature of which was to declare and establish a resulting trust in said William Smith in 120 acres of land in Linn county, described as follows: the north half of the southeast quarter, and the northeast quarter of the southwest quarter of section 3, township 57, range 19, containing 120 acres more or less, in favor of the heirs of said Rebecca.

The interest of Jackson Fyke in the land remains undisclosed. The interest of defendant Meacham is alleged by the petition and admitted by the answer of William Smith to be that of a present purchaser of said real estate, together with an adjoining tract of 120 acres, lying adjacent and south of the land in question and owned by respondent William Smith from him, without notice of the said trust or the equities of Rebecca Smith's heirs, under an executory contract of purchase for $8,400, on which Meacham paid $250 as an advance payment—the balance of the purchase money being due on March 1, 1903, and which contract of purchase the said Meacham was entitled to enforce, and by which, it is alleged in the petition, he obligated himself to pay one-half the entire purchase price, or $4,200, for so much of the said real estate as was held in trust.

The petition is a voluminous pleading, which, in substance and effect after setting forth the relationship of the parties and alleging their respective aliquot interests as heirs of Rebecca Smith, avers that Rebecca was the owner in fee of said 120 acres of land, that the legal title at her death and for many years prior thereto was and still is in the name of her son William, and that he held the same in trust for the use and benefit of Rebecca, his mother, and since her death in trust for her heirs. That in 1884 Rebecca Smith owned a large amount of money and personal property, and placed $3,500 thereof in the hands of her son William to invest in real estate in Linn county for her use and benefit, that the said William purchased the de-

scribed real estate with $2,400 of the said money and means of his mother in pursuance of an understanding with her to that effect, but took the legal title in his own name and thereafter held it in trust as aforesaid. That William, ever since said purchase, and until the death of his mother, acknowledged and recognized the trust relation. That in 1898 he borrowed $3,000 and secured it by a trust deed covering the said trust estate, as well as the said tract of 120 acres, lying immediately south and adjoining the same, and which said borrowed money remains unpaid, and which said trust deed is alive and in force. That the security of said trust deed should be first enforced and exhausted against the 120 acres of land owned by William in fee. That William Smith is insolvent. That the $4,200 to be paid by Meacham for the land held in trust, the premises considered, constitute a trust fund belonging to and subject to division between the heirs of Rebecca Smith. That defendant William refuses longer to recognize the trust relation and refuses to account to the other heirs for the proceeds of any part of the said real estate and threatens to and will convert the same to his own use.

The prayer is for a decree that William Smith holds the legal title to said first mentioned real estate in trust for the use, benefit and enjoyment of the heirs of Rebecca Smith. That the said heirs be decreed entitled to the proceeds of one-half of the Meacham sale in the proportion stated in the petition. That $4,200 of the Meacham purchase money should be decreed paid into court for the use and benefit of said heirs and that upon such payment into court of said trust fund and the payment by Meacham to William Smith of the share of the purchase money arising from the sale of Smith's own land, the title to all the land be decreed vested in Meacham, and that the share of the purchase money impressed with the said trust be partitioned among the heirs of Rebecca Smith in proportion to their respective interests, and that the $3,000 deed of trust be de-

creed to be first enforced against William's moiety of the land, or be satisfied out of his share of the proceeds of the Meacham sale.

The separate answer of the defendant William Smith raises the only issues (the other defendants defaulting), and after admitting the death and intestacy of Rebecca Smith as alleged, it denies she was the owner of the real estate in question and avers that had she died seized or possessed of any estate, then the plaintiffs and defendants, together with Oscar Crossland and one Preston, grandchildren of hers and entitled as such to certain interests in her estate, would be the heirs at law of Rebecca Smith. The answer then alleges that on the 29th day of May, 1884, the defendant William contracted to purchase of James O. Crandall all the real estate in question, consisting of 240 acres, for the price and sum of $4,800, and received Crandall's title bond for a conveyance to be executed on the 1st day of March, 1885. That in compliance with said bond the said Crandall and his wife on the 27th day of November, 1885, executed a general warranty deed to defendant to all said real estate. That Rebecca Smith was possessed of certain money and means acquired out of the estate of her deceased husband, defendant's father, on account of her dower interest in his estate in Illinois, where her husband died, and the answer then proceeds as follows:

"That after said defendant purchased said 240 acres of land aforesaid, a part of which is described in plaintiffs' petition, said defendant received from his mother, said Rebecca Smith, her dower money aforesaid, to the amount of $1,500, and that amount only, and which he used in part payment for said 240 acres of land, and that it was agreed between him and his mother that she was to have an interest in said land the same, and that only, as a dower interest therein for and during her natural life, the same as she had owned in her deceased husband's estate in Illinois, in considera-

tion of said money so furnished said defendant, and at her death said right and interest in said land was to absolutely terminate and end. That by a subsequent arrangement between said defendant and his mother she, with one of her sons, a brother of said defendant, occupied and used a part of said 240 acres of land for a considerable period of time, and that while they so occupied and used said land, said defendant furnished his mother, upon her request so to do, a large amount of money, stock and farm supplies, used and consumed by herself and said son, with whom she was then living, amounting in the aggregate to the sum of $1,760, and more. That said defendant also paid out for his mother with his own money and means the further amount of $450.45 in the aggregate, after he had received said sum of $1,500 from her. That said defendant's mother and her son with whom she undertook to carry on farming and stock raising for a time on said land, made a failure in their said attempt and lost substantially all his mother had invested in said business, to the amount and more, as aforesaid, and having made such failure and having used up and expended largely more money and means furnished by said defendant than the $1,500 he had theretofore obtained from her, she returned to said defendant's home, where she had resided before undertaking said farming business, and thereafter resided with said defendant until her death; and that during said time, after her return to his home, said defendant kept, maintained, cared for and supported her at his own expense and entirely out of his own means, and that at her death he had her remains conveyed back to the State of Illinois for interment and paid all the expenses connected therewith.

"That when said Rebecca Smith returned to said defendant's home to reside, after her failure in farming, she disclaimed any further interest in said land or any part thereof as dower or any other interest therein, for the reason and because said defendant had fully

and entirely paid her back all the money, and largely more, than she had furnished him, as aforesaid, and in further consideration that said defendant would continue to support, maintain, and care for her, as aforesaid, and at her death give her remains proper interment at his own expenses, and which undertaking said defendant says he faithfully carried out and, in every respect, kept and fulfilled.''

It is next alleged that at the time Crandall and his wife executed the deed to respondent William, Rebecca Smith was present, knew about the making of said deed and knew it was made solely and absolutely to him, William, and fully acquiesced therein, and that furthermore Rebecca was present when the defendant William executed a deed of trust on the 240 acres of land for the purpose of securing $2,500 of borrowed money to complete the payment to Crandall of the original purchase money, and that she interposed no objections to his doing so but approved the same.

After admitting the contract of sale to Meacham at the price and on the advanced payment alleged in the petition and on the terms stated therein and that Meacham on full payment would be entitled to a deed, the answer denies every allegation of the petition not theretofore specifically admitted to be true.

The reply denied every allegation in the answer setting up new matter, and on issues thus outlined the cause was heard in October, 1902, and the chancellor rendered judgment dismissing plaintiffs' bill, from which judgment plaintiffs in due form appeal here.

Was the equitable problem submitted to the chancellor solved correctly? We think not, and this for the following reasons:

There was no proof that Oscar Crossland and —— Preston were grandchildren and heirs of Rebecca Smith as alleged in the answer. Nor was there any proof that the estate, if any, of Rebecca Smith in the Crandall land was to follow and be impressed with the

Stevenson v. Smith.

limitation on her estate in her deceased husband's land in Illinois and thus become a dower interest, lapsing at her death, as alleged in the answer, nor was there any satisfactory proof forthcoming supporting the averment in the answer to the effect that at a certain time she disclaimed any further interest in the land in consideration of past support and the undertaking of respondent, William, to support her in the future and maintain and care for her until her death and give her remains proper interment at his own expense, and, hence, these defenses may be ignored.

At the very threshold of the consideration of the case on review, lies the issue of fact as to what money, if any, was turned over by Rebecca Smith to her son William and by him used in the purchase of the Crandall land, the investigation of which leads us to the State of Illinois and to the estate of Johnson Smith, there situate, the said Johnson being the ancestor of the plaintiffs and of the defendant William, and the deceased husband of Rebecca. It seems that Johnson Smith died in the State of Illinois, intestate, seized of certain real estate there lying, and leaving a widow, Rebecca, and seven heirs. The statutes of Illinois relating to dower and descents were not introduced in evidence, and in the absence of such proof the "system of unwritten law, not evidenced by statutes, but by tradition and the opinions and judgments of the sages of the law" (Riddick v. Walsh, 15 Mo. l. c. 536), known as the common law, must be assumed to be in force there, for divers reasons, e. g. because, prior to our Independence, Illinois was a part of the dominions of the King of Great Britain, because it was settled by English speaking people, who brought all the principles of the common law applicable to their situation with them as an inherited birthright, and because Illinois was a part of the Northwestern Territory, and, by the provisions of the Ordinance of July 13th, 1787, ceding that territory, the common law became the law of the land.

[Penny v. Little, 4 Ill. (3 Scam.) 301; Flato v. Mulhall, 72 Mo. 525; White v. Chaney, 20 Mo. App. l. c. 396.] Assuming, then, the existence of common law dower in Rebecca Smith, it seems her dower never was formally adjudicated as admeasured and assigned. It seems, furthermore, that several of the heirs of Johnson Smith conveyed to their brother William their several undivided interests in said real estate; and, moreover, that on the thirteenth day of August, 1884, the respondent William Smith and his wife, together with a sister, Adelaide, and his mother, Rebecca, conveyed the real estate of Johnson Smith to one Harrison. According to the record before us, William Smith had shortly theretofore acquired the interest of his sister Samantha Kent, of his sister Hannah Wilson, and of one other heir, for $650 each. These three interests acquired by purchase, together with his own, by descent cast, he, as said, conveyed by deed in which his mother, Rebecca, and one other sister joined, the consideration being $7,200. Harrison purchased the undivided interest of another heir, Aurelius, for $800. How Harrison acquired the title of the seventh heir, one Jasper Smith, is not shown by the record. But as both parties proceed on the theory that the whole fee passed to Harrison for $8,000, we may assume such to be the fact. Assuming the most favorable theory for William Smith, the result will be that the respective interests of the children, subject to the mother's dower, were valued at $800 each at the date of the conveyance on August 13th, 1884, aggregating $5,600, thus leaving for the widow's share, $2,400. What property, if any, William possessed independently of his interest inherited and acquired in said real estate does not appear with any certainty, and the same may be said of the personal property owned by the widow, but it is testified that she had personal property and that William had personal property, the character and extent of which may only be guessed at.

We infer from the record that the heirs of Johnson Smith were adults, and, this being so, it is but reasonable to conclude from the facts shown that the dower interest of the mother, by some domestic arrangement, was commuted into cash and turned over to her as a result of the Harrison sale, and there is evidence that she brought to Missouri so much as $3,000.

William Smith by answer admits that $1,500 of this money was turned over to him and was invested in the Crandall farm. Appellants concede that the condition of the proof is such that there is no satisfactory evidence of more than that sum having been so employed, and in this situation it becomes material to ascertain, if possible, under what arrangement this money was turned over to William Smith and so used by him. Appellants contend it was under an understanding that the widow was to pay half of the purchase-price of the Crandall farm, and was to have the north 120 acres thereof on which was a dwelling house, and that William Smith was to pay the other half and was to own the south 120 acres of the Crandall tract on which was another dwelling house. Appellants concede that the widow did not pay one-half of the purchase-price, but they contend that the investment was made under such circumstances that to make her own a moiety the widow should bear the burden of one-half of $1,800, the balance of the purchase-price, which was merged into a certain mortgage indebtedness due an insurance company, presently to be considered. On the other hand, respondent contends in his brief in this court (somewhat at variance with his pleading) that while he received $1500 from his mother to invest, it was never invested in the land, but was repaid to her by him under circumstances presently to be considered. This brings us to the question of what arrangement existed between William Smith and his mother at the time of this investment and what were the circumstances surrounding the parties prior to and at the time

of the conveyance of the Crandall land which was made on the twenty-seventh day of November, 1885, and made solely to William Smith as grantee.

As prone to happen in family compacts when the parties deal with each other loosely under the close and tender confidences of the domestic relation, and not at arm's length and face to face under the safeguards of correct business form, it becomes a delicate task to reconstruct ancient matters with fidelity and in true perspective when some of the actors are dead, when memory is twisted by self interest and conclusions, as wishes father to the thought, usurp the office of facts. Such troubles exist in this case, where grains of fact, as wheat, are hid in bushels of chaff, as conclusions; but we think the record places beyond reasonable doubt the ultimate fact that the aforesaid money of the mother was not taken over by William as a loan and then repaid, and was not placed with him for investment and returned to her prior to investment, and this is predicated of the following condition of things:

It appears that in the May preceding the Illinois sale, to-wit, in May, 1884, William Smith came to Linn county, Missouri, and negotiated the purchase of the Crandall tract for $5,800. Some of the evidence indicates that he agreed to pay $19.50 per acre for 240 acres, amounting to $4,680. Other evidence indicates that he agreed to pay over $5,000. The answer avers the purchase-price was $4,800 and the cause is practically submitted to us on both sides on the theory that such is the correct amount. The original contract of purchase, if one were entered into, is not in evidence, but a bond was executed by Crandall on the twenty-ninth day of May, 1884, and it is not uninstructive to give heed to its recitals, which are, *inter alia,* that the real estate was to be conveyed to William Smith on the first day of March, 1885, that the sum of $4,350 remained due on the purchase-price (the bond being silent as to the advance payment), that this balance was

evidenced by two notes, one for $2,550 and due on or before October, 1884, and one for $1,800 due in five years from date with eight per cent interest from March 1st, 1885; and said bond was conditioned on the conveyance by Crandall to William Smith of the whole tract of 240 acres on the said first day of March, 1885, when the balance then due Crandall was to be secured by a deed of trust or mortgage.

There is a controversy as to the ownership of the money, conceded to be $450, paid Crandall as an advance payment, and ingenious speculation is indulged in pro and con anent that ownership. *A priori* reasoning would seem to result in the conclusion that it is more likely to have been a payment out of a common fund than otherwise, but we consider the question more curious than decisive, and therefore discard its consideration, further than to say that in our opinion the *onus* was on appellants to show that the mother participated in this payment, and that they failed to carry that burden satisfactorily to the legal mind.

The precise time that William and Rebecca Smith and their respective families entered into possession of this land is not disclosed, but by reasonable inferences, fairly to be deduced from proved facts, it may be arrived at that either in the fall of 1884, or in the early winter or spring of 1885, Rebecca Smith and her son Jasper took possession of the north 120 acres and William Smith and his family took possession of the south 120 acres, moved into the dwelling houses thereon and supplied themselves with the necessary implements of husbandry, provisions and stock incident to carrying on farming operations independently of each other.

Serving no useful purpose, we shall not undertake to present here the evidence in detail, but it shows that possibly during the entire year of 1885 Jasper Smith and his mother farmed the 120 acres they took possession of, and it seems that Jasper fell into trouble, exe-

cuted chattel mortgages on the personal property of his mother and otherwise involved her, as well as his brother William, in financial embarrassment, and, having done so, left the country toward the end of 1885 or the commencement of 1886. His irregular dealings caused substantially all of his mother's stock and farming implements to be subsequently swept away under mortgages, and not only so, but William paid other debts for him, we infer, unsecured ones. The construction we place on the record before us is that it is the contention of respondent that his payments of Jasper's debts created a present indebtedness of the mother to him, and that thereby, and before the Crandall conveyance was executed, all the money furnished by Rebecca Smith towards the purchase of the farm was off-set or repaid to her, so that, in consequence thereof, when Crandall made his conveyance it was made to William as grantee because Rebecca had lost all interest in the matter. But we cannot persuade ourselves to accept this view of the testimony. In the first place, the contention is in the nature of a confession and avoidance, and the laboring oar was held by respondent. In the second place, the evidence is not satisfactory that payments made on behalf of Jasper were made prior to the making of the Crandall conveyance. In the third place, the record does not satisfy us that all the payments made by William Smith on behalf of his brother Jasper were made under such circumstances as created a legal liability upon the mother to refund the money so paid by William, nor is there evidence that the mother legally bound herself to repay such sums to William or that the adjustment of Jasper's affairs, to sustain the family honor, had the effect of wiping out the entire estate of the mother. To the contrary there is evidence persuading us that William Smith was somewhat involved by Jasper's inadvertences on his own personal behalf, and that the entire burden thereof ought not to be shifted to and rest upon the shoulders of the mother.

In the fourth place, the Crandall conveyance was not made on the first of March, 1885, as nominated in the bond, but, as said, was executed on November 27, 1885. There is no testimony before us as to when the $2,500 note mentioned in the bond was paid, but there is testimony that as part of the arrangement for the Crandall conveyance, a $2,500 loan was negotiated with the Mutual Benefit Life Insurance Company, of Newark, N. J., evidenced by notes and coupons executed alone by William Smith and secured by a deed of trust to one Toms, trustee, on the whole Crandall tract, and that out of the money so procured, $1,800 or $1,900, the remainder of the purchase money, was paid to Crandall and the transaction with him closed by his conveying directly to William Smith. The mother was present at this conveyance and at the execution of this trust deed and therefore knew the whole title passed to her son, William, and that his credit and the land were alone pledged for the insurance company's loan. But we do not attribute to the transfer to William, instead of to the mother and William, and to her knowledge of that fact the radical significance attached by respondent. Respondent contends that the foregoing facts indicate his mother had lost all interest in the land. But the very fact that the mother was present and had these matters explained to her is evidence that she had, or was thought to have, a material interest in the transaction. At that time William Smith said that his brother, Jasper, "had done some bad work and he had to meet that. There was no one else to pay it." The amount whereof was placed by one witness at $350, and the evidence indicates that some of the money borrowed from the insurance company went in that direction. At that same time Mrs. Crandall, who signed the deed with her husband to William Smith, testified that Rebecca Smith made no objection to making the deed to William and seemed to favor it; that she heard it read over and that she said her son William was her main dependence. That

Jasper had got away with so much money that she had to depend upon William, and he was the only son that she could depend upon. We are of the opinion the record bears out the notion that the embarrassments caused by Jasper's conduct changed the original intention of the parties, which possibly was to pay half and half on the land, so that it left of the mother's money only $1,500 therein, and that as William was assuming the burden of a mortgage indebtedness and the mother was growing old, the title was placed in him until such time as the mortgage could be paid off and the equities could be adjusted. This view is fortified by evidence to the effect that the mother at a time afterwards asked William for a deed, and he gave the mortgage as an excuse for not making one. After the Crandall deed was made and after Jasper Smith went away, Hannah Wilson, a married daughter of Rebecca Smith, came with her family and for some time farmed this land with the mother, possibly for a year or more, with indifferent success, and then Hannah moved elsewhere. Thereupon it seems that William Smith assumed control of the whole tract, except five acres with the dwelling house, and used the farm to pay the accruing mortgage interest and there is evidence to the effect that its use did not more than pay such interest. Subsequently Hannah Wilson returned and lived with her mother for a series of years on the five acres referred to, and finally within a few years of her death, when broken with old age, the mother went to the home of William, residing with him and at intervals with her daughter Hannah until she died, William caring for her, aided somewhat by Hannah Wilson, and taking her remains to Illinois and burying her there at his own expense. During all these years the evidence shows that William Smith referred to the north 120 acres as his "mother's farm" and as his "mother's place," and that she in his presence spoke of it as her farm, that it was assessed in her name, that at least on one occasion William Smith was con-

sulted by the assessor about the valuation of one forty
acres of it and gave his estimate of it knowing that it
was being assessed as his mother's and that he was be-
ing consulted as her business man, and that he never
claimed the fee till her death.   There is further evi-
dence that, commencing prior to the Crandall purchase
and continuing down to the end, except for a short time
while Jasper was on the farm, William was his mother's
business man, managing agent and confidential adviser.
The record shows that at another time she asked Wil-
liam Smith for a deed and he again excused himself by
claiming that some boy had carried away his papers.

Rebutting the showing made by appellants is evi-
dence from the sons and daughters of respondent to the
effect that their grandmother on returning to their
father's home frequently referred to herself as ''broken
up.''   But we are inclined to the notion that these ex-
pressions, taken with all the surrounding facts and
circumstances, were indicative of the emotions of
an old lady who had fallen on evil and reminiscent days,
rather than as assertions of a settled business fact. And,
to sum up, in our opinion the record strongly prepon-
derates in favor of the contention of appellants that
Rebecca Smith had, and died with, an interest in the
land corresponding to the amount of her payment of
$1,500 on its purchase.   This being so, we do not think
the state of proof and the equities of all parties require
us to hold that the heirs of Rebecca Smith are entitled
to one-half of the real estate, or the north half, and that
their interests therein should be impressed with the
amount of one-half of the $1800 or $1900 paid out of
the insurance loan, as contended by appellants, but we
think the very right of the case will be more justly at-
tained in disentangling the complications by giving the
heirs such proportion of the land as $1,500 bears to
$4,800, i. e., fifteen-forty-eighths or five-sixteenths, but
this should free of all mortgage liens.   And this hold-

ing is abundantly warranted by the adjudicated cases (see authorities cited in the respective briefs of counsel), which authorities announce the doctrine, neatly formulated by appellants' counsel, that "where land is purchased by one in his own name with the money of another, a resulting trust is created by implication of law which follows the ownership of the money. And where a part only of the purchase money is furnished by the beneficiary, the trust is for a proportionate share of the land bought."

The foregoing view leaves out of account respondent's contention of laches urged here as a justification for the finding of the chancellor, *nisi,* which contention will now receive attention. It will be noted that the Statute of Limitations is not pleaded as a defense. Evidently the learned counsel for respondent deemed such defense not applicable to the facts of the case and therefore did not plead the statute, as is necessary, if relied on as a defense, in possibly all cases except eject-ment suits. Neither does the answer plead laches or staleness as a defense. On this score it may be said, that while it has been held that it is necessary to plead laches in order to invoke them as a defense (Bliss v. Prichard, 67 Mo. l. c. 191), yet the better doctrine seems to be that the defense of laches is one of which it is not necessary to take advantage by the pleadings, and if the case as it appears at the hearing is liable to such objections, the court may and usually will remain passive and refuse relief and decline to entertain the suit. [12 Ency. Pl. & Pr., 829, and cases cited; Murphy v. De-France, 105 Mo. l. c. 69, *et seq.*] But there is another proposition that must be reckoned with in this connection, viz., that laches is a question of fact on the evidence, determinable upon the particular facts and circumstances of the case. [Pike v. Martindale, 91 Mo. l. c. 285.] In this particular courts treat laches the same as they do the kindred question of negligence, that is to say, there is no cast-iron rule for determining

what negligence is, nor what laches are, but the matter is necessarily left open so that the court may determine such question from the circumstances of each case and the immediate surroundings of the parties. We must avow a judicial indisposition to apply the doctrine of laches with close particularity to the dealings of an old mother with her confidential business manager, a son, with whom she resided, and on whom she depended for the solaces of filial ministrations. We are inclined to the notion that a court of conscience would better subserve the interests of domestic happiness and welfare by refusing to apply the doctrine of laches to relations and dealings of the kind here indicated, except in a pronounced and unequivocal case, and such a case is not the case at bar; and it goes without saying that if laches be not allowed as a defense against the mother, it is unavailing in the case for any purpose, since it may not be imputed to plaintiffs, who sued timely upon their ancestor's death.

The record does not satisfy us of the existence of the mortgage for $3,000 pleaded in the petition. If proof thereof was offered, it has escaped us, although the case was submitted on the theory that it existed. The chancellor should take proof on this issue of fact. If such mortgage exists, it should be satisfied solely out of the interest of William Smith in the real estate, if the same be of sufficient value to pay it off. Neither can we say that the executory contract of Meacham looking to the purchase of the land will be consummated. It may be it cannot be specifically enforced. Proof on this question should be taken by the chancellor. Nor are we satisfied at this time to grant a partition and distribution of the proceeds of the Meacham sale, should they be paid into court. Such partition and distribution should await an administration upon the estate of Rebecca Smith, because the interests of her children by descent cast are subject to the payment of her debts, and while the question is not here and there-

fore we do not pass upon it, yet it may be that respondent William Smith, at least for funeral expenses of his mother and her interment in Illinois, may be able to establish legal claims against her estate.

The cause is reversed and remanded with directions to the court below to take proof on the present existence of a mortgage on the whole tract; to decree that the mortgage, if existing, be paid by William Smith, and, as between him and the other heirs, should become a lien on his interest in the real estate and be satisfied therefrom in the first instance; to decree, further, that the heirs of Rebecca Smith, including the respondent William, are entitled to an undivided five-sixteenths of the land described in the petition; and to make such decree in regard to the Meacham sale as the facts warrant, and to otherwise proceed in accordance with this opinion.

All concur.