RACHEL CHERRY, Appellant, v. JOHN CHERRY.

**Division Two, May 26, 1914.**

1. **EVIDENCE: Presumptions: Laws of Other States: Illinois.**
   In the absence of proof to the contrary it will be assumed
   that the common-law rules as to marriage were in force in
   Illinois in 1905, when the alleged marriage in controversy here
   is claimed to have taken place.

2. **DIVORCE: Appeal: Findings Below.** Appellate courts in Mis-
   souri are not absolutely bound by the facts as found by the
   trial court in divorce cases, yet where the evidence does not
   greatly · preponderate in favor of either party, but presents
   sharp conflict, the ascertainment of the ultimate fact depending
   largely upon the credibility of the respective witnesses, the
   appellate courts must necessarily defer largely to the finding of
   the trial court.

3. ————: **Evidence: Common-Law Marriage.** Evidence in a
   divorce suit *held* to sustain a finding that there was no common
   law marriage.

Appeal from Monroe Circuit Court.—*Hon. David H.
Eby,* Judge.

AFFIRMED.

*Wm. N. Hairgrove, Ragland & McAllister* and
*James P. Boyd* for appellant.

*Elliott W. Major, W. E. Whitecotton, W. W.
Barnes* and *James H. Whitecotton* for respondent.

WILLIAMS, C.—Plaintiff, claiming to be the common-law wife of defendant, sues for divorce and the sum of fifty thousand dollars as alimony in gross. The petition alleges "that plaintiff and defendant were lawfully married on or about January 1, 1905, in the State of Illinois; that they continued to live together as man and wife from that date till May 30, 1907; that, during all that time, she faithfully demeaned herself and discharged all her duties as the wife of defendant," etc.; "but that defendant wholly disregarding his duties as the husband of plaintiff has been guilty of committing adultery with one Lina Baskett at the county of Monroe and State of Missouri, which said act of adultery, so committed at the said county of Monroe and State of Missouri, was by defendant so committed during the married life of plaintiff and defendant;" that plaintiff was at the time of filing the suit a resident of Monroe county, Missouri. The petition describes the real and personal property owned by defendant, alleged to be of the value of $100,000, and prays that she be allowed as alimony in gross the sum first above mentioned.

The answer denied the marriage with plaintiff; denied the adultery with Lina Baskett but alleged that defendant and said Lina Baskett were lawfully married on the 16th day of May, 1907. The answer further denied that plaintiff was a resident of Monroe county, Missouri, at the date of the filing of the petition, or that he was the owner of property to the value alleged in the petition.

Trial was had in the circuit court of Monroe county. The court found the issues in favor of the defendant and specifically found that plaintiff and defendant were never married. A decree was entered dismissing plaintiff's petition. Plaintiff duly perfected an appeal to the St. Louis Court of Appeals, but that court properly certified the case here because of the jurisdictional amount involved. The main contested

issue was over the question of the marriage. Upon this issue, the evidence of plaintiff and defendant was very conflicting. Plaintiff testified that she and defendant were married January 1, 1905, at Chicago, Illinois, and that the marriage was consummated in the following manner:

"Q. Now I will ask you was there any agreement, if so, just state the agreement between you as well as you can remember it? A. I asked him to fulfil his pledge to me, and he said, 'the folks at home would almost lynch him, her people would be very angry, they did not seem to like him, and they would almost lynch him if he married me now, at that time, so soon after her death,' but he said, 'a public marriage is not necessary at all, that the words that the preacher says and the fees he receives do not make us husband and wife,' he told me, 'we love each other,' he asked me 'if I did not love him,' I said 'yes,' he said, 'we love each other well enough to be husband and wife now,' and I said 'yes,' and he put his arms round me and kissed me and says 'Sweetheart, you are my wife now, you take me as your husband now and all through life and I take you as my wife and we are husband and wife,' and I said 'Yes.'

"Q. After that did you live and cohabit together? A. Yes, sir."

At the time of the marriage, defendant's home was at Jacksonville, Illinois, but his occupation was that of a paving contractor and the greater portion of his time was spent at Centralia, Illinois, and other towns where he had contracts for paving work. Plaintiff further testified that she and defendant continued to live together as man and wife until May, 1907; that during this time defendant visited plaintiff about once a week, spending the remainder of his time at different cities where his paving contracts were being performed. Plaintiff resided in Chicago two or three years, next prior to the marriage, having moved there from Bloom-

ington, Illinois, in 1902. After the marriage, plaintiff continued to live in Chicago, at the place occupied by her prior to the marriage, until about September, 1905, at which time she moved her furniture to the home of her sister in Bellevue Place, a suburb of Chicago, and remained there about a month, going from there to visit another sister living at Clinton, Iowa, where she remained until the latter part of November, 1905. From Clinton, Iowa, she went to East St. Louis, Illinois, and was there met at the train by defendant and she and defendant went to the Weiss hotel in East St. Louis and lived there as man and wife until September, 1906; defendant visiting plaintiff at the hotel each week, generally on Sundays. In September, 1906, plaintiff moved to the Milton hotel in St. Louis, for the purpose of learning the art of hair dressing and manicuring. On December 16, 1906, she went to Las Vegas, N. M., for the purpose of working at her newly-acquired profession. She remained in New Mexico until the latter part of May, 1907, at which time she returned to Illinois. Upon learning that defendant was at Centralia, Illinois, she immediately went there and registered at a hotel under the name of "Mrs. C. John," as she says, "to avoid notoriety." She had a talk with defendant and learned from him that two or three weeks prior to that date he had married one Lina Baskett. Plaintiff asked defendant if he had secured a divorce before marrying Miss Baskett and he said: "No. Never mind, I will always take care of you; treat me right." Defendant gave plaintiff a check for $250, payable to Rachel Pierce—that was plaintiff's maiden name—and plaintiff left the next day. In June, 1907, she saw defendant a short time in East St. Louis, while he was waiting for a train. In September, 1907, she went to McLeansboro, Illinois, to see defendant, and asked him to set aside his last marriage and allow her to procure a divorce—telling defendant that he could then remarry. This last

meeting was about midnight and they talked the matter over until about three a. m. Plaintiff came to Paris, Missouri, to reside, in October, 1907, a day or two before this suit was instituted. After January 1, 1905, and while plaintiff was living in Chicago and while visiting her sister in Iowa and later while living at the hotel in East St. Louis and also at the hotel in St. Louis, she received letters from the defendant. These letters and the envelopes in which they passed through the mail were introduced into evidence. The envelopes were addressed, "Mrs. J. C. Cherry." In these letters, defendant generally addressed plaintiff as "Dear Sweet Hart" and the letters were usually signed "Your Sweet Hart Husband" or "Your Sweet Hart." During this time, defendant paid the house rent; paid the hotel bill for plaintiff and plaintiff's little daughter who was living with her and, generally, paid, or sent, her about ten dollars a week. Just before going to New Mexico, defendant gave plaintiff two hundred dollars. One witness for plaintiff testified that she called at plaintiff's house in Chicago and that defendant came to the door and said that his wife was out. Another witness testified that she heard defendant refer to plaintiff as his wife. Plaintiff testified that defendant introduced her as his wife to the manager of the hotel in East St. Louis. The manager of the hotel also testified and corroborated plaintiff in this statement, and further that defendant generally spent Sundays, in 1906, with plaintiff at the hotel in East St. Louis. Plaintiff testified that on these weekly visits they cohabited as man and wife, both in Chicago and at the hotel in East St. Louis, and that defendant spent two nights with her at the hotel in St. Louis, Missouri. On cross-examination, plaintiff testified that she first met defendant at the Windsor hotel in Bloomington, Illinois, in 1896. Plaintiff's girlhood home was at Todd's Point, Illinois, and, at that place, in 1895, she met one Charles Watson. After keeping

company with him about six months, her parents objecting, she eloped with said Watson and a marriage ceremony was performed between them by a justice of the peace at Pana, Illinois, November 30, 1895; that in 1896, plaintiff and her husband Charles Watson came to Bloomington, Illinois, and lived at the Butler hotel, as man and wife, for two or three months; thereupon Watson disappeared and plaintiff then learned that at the time she married Watson he was a married man with a wife and three children. A short time after Watson disappeared, and on September 28, 1896, plaintiff gave birth to a child, a daughter. Watson died in 1904 or 1905. After plaintiff met defendant they went driving several times and in 1899 defendant furnished some rooms over a saloon at Bloomington, Illinois, and made arrangements for plaintiff to act as his housekeeper. This she did from 1899 to 1902, for which defendant paid plaintiff thirty dollars a month. During this time, defendant was engaged throughout the summer months, doing paving work at Bloomington, and the remainder of his time he spent at Jacksonville, except the occasional visit that he made to Bloomington. At this time defendant was a married man, his wife and one child living at his home in Jacksonville, Illinois. His first wife died November 14, 1904. Plaintiff moved from Bloomington to Chicago in 1902, taking with her the furniture which she used in Bloomington and defendant continued to visit her frequently in Chicago, up to the time of the alleged marriage on January 1, 1905. January 1, 1905, was on Sunday. Plaintiff testified that defendant came to Chicago on Friday preceding the marriage and spent Friday night and Saturday night at her place of residence; that he slept on a cot in a little alcove adjoining the room in which plaintiff slept, with curtains at the entrance to the alcove, and that they did not occupy the same bed at any time during the two nights. She claims that the marriage contract was entered into Sunday

afternoon and that plaintiff left Chicago that night; that a short time after the marriage agreement and on the same afternoon, plaintiff's brother called at her place of residence and went down town with plaintiff and defendant for dinner. On being asked if she told her brother that she and defendant had just become man and wife, she answered that she did not, but told him that she was "happy;" that she did not tell her brother because she had agreed with the defendant to keep it as a secret. A Mrs. Wiggins testified that she visited plaintiff in the spring of 1905 at Chicago and that defendant slept in the same bed with plaintiff and called her his wife. This witness further testified that plaintiff's reputation for virtue and chastity in Bloomington from 1899 to 1902 was good. The evidence showed that defendant owned a farm of approximately sixteen hundred acres near Paris, Missouri, reasonably worth fifty dollars per acre and that he was the owner of considerable personal property, such as live stock and farm implements thereon located and also owned some real estate in Jacksonville, Illinois. The evidence further showed that defendant and his last wife, Lina Baskett Cherry, frequently came to Paris, Missouri, to look over the farm, and cohabited as man and wife while staying at the farm on these visits. Defendant testified in his own behalf that his home and residence had always been at Jacksonville, Illinois; that he first met plaintiff at Bloomington, Illinois, in 1896, and was introduced to her by her husband Charles Watson; that plaintiff never kept house for him in Bloomington, but that she lived in his rooms at that place from 1899 to 1902; that in his rooms, he had his office desk, two beds, some chairs, etc., and that plaintiff and her brother, at one time, used the rooms for about six months. Defendant denied that he had ever had any talk of marriage with plaintiff, at Chicago or elsewhere, but said that on January 1, 1905, he was in Jacksonville, Illinois, at the home of his

sister, attending the celebration of his father's seventy-second birthday; that his father's birthday was January first and that for many years the family had observed the custom of assembling, on that date, for the purpose of celebrating the occasion; that he was in Jacksonville from December 29, 1904, until some time in March, 1905, and the greater portion of that time was laid up with the "grippe." He denied "that he had roomed with plaintiff in 1905, 1906, or 1907," and stated that he had not had sexual relations with plaintiff since 1903; that plaintiff never, at any time, claimed to be his wife; that he had been paying plaintiff money for ten or twelve years. He admitted that he had corresponded with plaintiff but testified that he did not think that the letters introduced in evidence were written by him; that while the handwriting looked like his and was similar to his he did not think the letters were written by him. He refused, however, to swear positively that he did not write the letters. He further testified that plaintiff came to Centralia in May, 1907, and demanded that he pay her one thousand dollars. He gave her a check for two hundred and fifty dollars and plaintiff returned to St. Louis. He next saw her at midnight at a hotel in McLeansboro, Illinois, where she demanded more money, stating that she wanted one thousand dollars; that plaintiff had a gun in the front of her dress and said that she was going to have "money or blood;" that he talked with her from midnight until three a. m., at which time he went back to his hotel and did not see her again until after suit was brought. He denied that he had ever introduced plaintiff as his wife. He admitted that he slept with plaintiff at times when he was in Bloomington and paid her money all the time and stated that he could not get rid of her and that he gave her the $250 at Centralia to get her "to go away and let him alone." Two of defendant's sisters testified that it had been the custom of their father's family for

many years to celebrate their father's birthday, which
occurred on January 1, and that they did so celebrate
on January 1, 1905, at Jacksonville, Illinois, and that
a photographer was called down to the house and a
family photograph was taken, and that defendant was
present on that occasion. One sister testified defend-
ant's first wife died November 14, 1904, and from that
time until the early part of 1905, defendant occupied
a room at her house and that he had been there sev-
eral days prior to the birthday celebration. The sister
also testified that during 1905, 1906 and 1907, paving
contracts kept defendant away from home a great
portion of the time, but that he would return to Jack-
sonville almost every week. J. P. Butler, the proprie-
tor of the Butler hotel at Bloomington, Illinois, W. S.
Cass, night clerk at the Butler hotel, Dr. Butler and
his wife, George Purcell, a saloon keeper, and Adam
Hess, a policeman, all of Bloomington, Illinois, testi-
fied that from 1899 to 1902 plaintiff's reputation for
virtue and chastity at Bloomington was bad. Defend-
ant's tenant on his farm near Paris, Missouri, the
Missouri, Kansas & Texas freight agent at Paris, Mis-
souri, the sheriff and the county collector of Monroe
county, Missouri, testified that beginning with March,
1906, defendant, on almost every Sunday during that
summer came over to Paris, Missouri, and went out
to his farm. The tenant testified that defendant made
these visits to the farm to help advise about the method
of carrying on the farming and the feeding of the stock
and that defendant made these trips on Sunday be-
cause his contracting work kept him busy through
the week. John Steele testified that he was the night
clerk of the hotel in McLeansboro, Illinois, on Sep-
tember 11, 1907, the night plaintiff came there to look
for defendant and that after plaintiff left he found an
empty automatic pistol box in her room. Thomas Mc-
Daniel testified that he was passing along the street
in front of the hotel at McLeansboro, September 11,

1907, and saw plaintiff and defendant on the step in front of the hotel, as defendant was leaving, and heard the plaintiff say that "it would take money or blood to square it." The check which defendant gave plaintiff at Centralia, Illinois, on May 29, 1907, was as follows:

| | |
|---|---|
| Centralia, Ill., 5/29 1907 | No. 15 |
| MERCHANT'S STATE BANK | (bearer) |
| Pay to Rachel Pierce or order | $250.00 |
| Two Hundred & Fifty & No/100 | Dollars |
| Advance payment of | |
| personal settlement | JOHN CHERRY |
| of all claims | J A V |

The check was indorsed "Rachel Pierce." On the same day an agreement was entered into between the plaintiff and defendant, as follows:

"I agree to pay Rachel Pierce otherwise known as Mrs. J. Cherry the sum of fourty dollars per month so long as she does not marry or have an oather man and I rachel pirce known as Mrs. John Cherry aggrees to in no way annoy John Cherry so long as he fulfills his obligations to me.

(signed)                           JOHN CHERRY,
                                   RACHEL PIERCE."

One of defendant's witnesses testified that he called at plaintiff's residence in Chicago in 1905 and that a name card was on the door bearing the name "Maria Watson." Defendant introduced in evidence plaintiff's first verified petition filed in this case. In that petition, plaintiff alleged that she and defendant were married on the 25th day of December, 1905, at East St. Louis, Illinois. Plaintiff, on rebuttal, testified that she did not read her first petition before swearing to it. She denied having the card "Maria Watson" on her door in 1905; and denied having a revolver at the time she talked with defendant at McLeansboro; she further testified that when she met defendant at Centralia in May, 1907, he demanded

that plaintiff deliver to him the letters that he had written her.

## OPINION.

I. There was no proof made that the doctrine of the common law concerning marriage had, at any time, been abrogated in the State of Illinois by legislative enactment. Absent such proof, it will be assumed that the common law in that respect was in force in that State on January 1, 1905, the date of the alleged marriage. This, for the reasons announced in the case of Stevenson v. Smith, 189 Mo. 447.

*Law of Other State: Presumptions.*

II. It is contended that the court erred in finding that plaintiff and defendant were never husband and wife. This is the principal point of contention in the case. Counsel for appellant state the proposition as follows: "There is one controlling question in this case. Was the contract as testified to by plaintiff (the marriage agreement of January 1, 1905), entered into between plaintiff and defendant? If this question is answered in the affirmative, then unquestionably the judgment should be reversed. If in the negative, then an affirmance should follow."

*Common-Law Marriage: Appeal: Evidence.*

As will be noted from a reading of the foregoing statement of facts, the evidence in the case is conflicting. Plaintiff testified that the marriage agreement was entered into on Sunday, January 1, 1905, and that cohabitation followed. Defendant denied the marriage contract and denied that he and plaintiff were ever married. He testified that on January 1, 1905, he was in the city of Jacksonville, Illinois, attending the annual celebration of his father's birthday. In this he is corroborated by two witnesses — his sisters. Plaintiff introduced in evidence a letter

258 Mo.—26

purported to have been written to plaintiff by defendant, January 3, 1905, at Jacksonville, in which he writes that he arrived there Sunday at midnight. Appellant contends that the letter corroborates plaintiff's testimony that defendant was in Chicago, Sunday, January 1, 1905. Nowhere in the letter does the writer mention Chicago or anything that would indicate a recent trip there. It would be just as reasonable to presume that he had returned from St. Louis or any other city as to presume that he had returned from Chicago, for aught the letter contains. Neither does the letter definitely say what Sunday he returned. The testimony to the effect that defendant introduced plaintiff as his wife to the proprietor of the East St. Louis hotel, even if conceded to be true, carries but little weight. This is not necessarily inconsistent with concubinage, for even though the relations of plaintiff and defendant were unlawful, such an introduction might well be expected as a prerequisite to their being allowed to occupy the same room upon his weekly visits there. Plaintiff's strongest corroborative evidence was contained in the letters which she claims to have received from defendant, addressed to her as "Mrs. J. C. Cherry," and signed "Your Sweet Hart Husband." However, one rather suspicious incident in connection with this testimony was, that while plaintiff admitted that she had received other letters from defendant, some of them prior to the date of the alleged marriage, and that these letters with others were delivered by her to her counsel, yet none of these pre-nuptial letters were offered in evidence by plaintiff nor was her failure so to do in any manner explained. That these prior letters may have been addressed and signed in the same way as the later letters, and therefore it was thought advisable, upon her part, to keep them out of the evidence, we can only conjecture, however, it is reasonable to suppose that had the letters written prior to January 1, 1905, been addressed and signed

differently from those written after the alleged marriage, plaintiff's able counsel would not have overlooked the great probative value of such a showing as furnishing strong corroboration of plaintiff's testimony concerning the marriage. That appellant's counsel were aware of the importance of such a showing clearly appears from the remarks of counsel made during the progress of the trial and incorporated in the bill of exceptions, yet the record contains no explanation as to why the other letters were not introduced. It must be admitted that the comparative weight of the evidence of the respective parties is difficult to determine. After a careful review of the evidence, we feel that an opportunity to see the respective witnesses and note their demeanor while on the stand would be a great aid in arriving at a correct solution of the problem. This opportunity we cannot have. The trial court did have such an opportunity. If plaintiff's testimony is given full credence, then there could be no doubt but that plaintiff and defendant were married on January 1, 1905. If, on the other hand, defendant and his witnesses are to be believed, plaintiff and defendant were never married. Such being the case, the determination of the fact of marriage is to be largely influenced or controlled by the credibility of the respective witnesses, and this being true, we should and must necessarily defer to the finding of the trial court, since he had the added advantage of seeing the witnesses and observing their demeanor while testifying. [Stevenson v. Stevenson, 29 Mo. 95.]

While it is true that in the review of divorce cases, it is the practice of the appellate courts in this State to not be absolutely bound by the facts as found by the trial court (Torlotting v. Torlotting, 82 Mo. App. 192; Barth v. Barth, 168 Mo. App. 423), yet where, as here, the evidence does not greatly preponderate in favor of either party, but presents sharp conflict, the ascertainment of the ulti-

**Divorce: Appeal.**

mate fact depending largely upon the credibility of
the respective witnesses, the appellate courts must nec-
essarily defer largely to the finding of the trial court.
[Long v. Long, 171 Mo. App. 202.]

Adding to the uncertainty or doubt arising from
the conflict of the evidence, the further uncertainty
or doubt created by the evidence tending to show that
apparently the sexual relations between plaintiff and
defendant were about the same before as after the
alleged marriage, that plaintiff upon meeting her
brother an hour or so after the alleged marriage ad-
mits that she did not tell him of the marriage; that
plaintiff moved to New Mexico for the purpose of
establishing herself in business as a manicurist, re-
turning after several months to Centralia, Illinois,
where defendant was temporarily located, and regis-
tering at a hotel there under the name of "Mrs. C.
John," as she says, to avoid notoriety; that she there
received a check from defendant, made payable to her
as Rachel Pierce (her maiden name), afterwards in-
dorsing the check in that name; that she there also en-
tered into a certain contract with defendant signing her
said maiden name, in which contract she is referred to
as "Rachel Pierce, otherwise known as Mrs. John
Cherry," we do not feel justified in saying, and there-
fore will not say, that the court erred in finding that
plaintiff and defendant were never married.

It, therefore, follows that the court did not err
in finding the issues for defendant and entering a de-
cree dismissing plaintiff's petition.

The judgment is affirmed. *Roy, C.,* concurs.


PER CURIAM.—The foregoing opinion of Wil-
liams, C., is adopted as the opinion of the court. All
the judges concur.