WALTER F. SCHOLL, Respondent, v. NELLIE A. SCHOLL, Appellant.

St. Louis Court of Appeals.    Submitted on Briefs April 6, 1916. Opinion Filed May 2, 1916.

1. APPELLATE PRACTICE: Appeal in Divorce Case: Form of Affidavit for Appeal. On an appeal by defendant from a decree dismissing her cross-bill and granting plaintiff a divorce, it is not a prerequisite to a review of the entire case that the affidavit for appeal be prepared as though two cases were appealed, but an affidavit in conventional form is sufficient.

2. ———: Divorce: Conclusiveness of Findings. While, in divorce cases, as in all actions that partake of the nature of suits in equity, the appellate court pays great deference to the conclusion of the trial court on conflicting evidence, it nevertheless reviews the evidence and determines the case on its own conclusions thereon; such a case addressing itself to the conscience of the court, and this applying to the appellate, as well as the trial, court.

3. DIVORCE: Indignities. It is impossible to lay down any rules that will apply to all cases, in determining what indignities are grounds of divorce because they render the condition of the injured party intolerable. The Legislature chose to leave the subject at large, and by the general words employed, evidently designed to leave each case to be determined according to its own peculiar circumstances.

4. ———: ———: For an indignity to be intolerable, in the statutory sense, as ground for divorce, it must amount to a species of mental cruelty.

5. ————: **Uncorroborated Evidence.** Divorce is rarely granted on the uncorroborated evidence of a party.

6. ————: **Indignities: Sufficiency of Evidence.** On appeal from a decree dismissing the wife's cross-bill charging indignities and granting the husband a divorce on the ground of indignities, *held*, under the evidence, that the husband's petition should have been dismissed and the wife granted a divorce on her cross-bill.

7. **APPELLATE PRACTICE: Divorce: Alimony: Disposal of Case on Appeal.** The appellate court, on remanding a divorce case to the circuit court with directions to grant the wife a divorce, may order that she be allowed alimony in a certain amount.

Appeal from St. Louis City Circuit Court.—*Hon. Wilson A. Taylor*, Judge.

REVERSED AND REMANDED (*with directions*).

*Nat Steiner* and *Hugh D. McCorkle* for appellant.

*H. A. Loevy* for respondent.

REYNOLDS, P. J.—On November 9, 1912, plaintiff filed his petition for divorce from the bonds of matrimony existing between himself and the defendant. The petition was sworn to by plaintiff November 4, of that year. After setting out that the parties were married July 25, 1906, and lived together thereafter as husband and wife, two children a boy, Walter E., then five years old, and a girl, Bernice, then sixteen months old, being born of the marriage, and setting out that during the time they lived together plaintiff had demeaned himself properly and had faithfully discharged all his duties as a husband, and setting out the necessary averment as to residence in this State, plaintiff alleges as his cause of divorce that defendant was guilty of such indignities as to render his condition intolerable. The acts charged as indignities are lack of neatness and proper attention to her house and children; untidiness about the house; neglect of proper care of the children; failure to keep her kitchen and cooking utensils in a cleanly condition and allowing them to become filthy; spending her time in gossiping with the neighbors and visiting her relatives; refusing to do the laun-

Scholl v. Scholl.

dry work; neglecting to mend his clothing; allowing it to disappear from the house; extravagance in the use of money which he furnished for household and other expenses, amounting, as he charges, to $1000 per annum, and compelling him to borrow money to pay money which she had borrowed, so that he is in debt to the amount of $300; refusing to inform plaintiff of the manner in which she had spent the money he had given her, which up to May, 1910, amounted to $1000 per annum; that in May, 1910, by reason of his financial straits and of her extravagant spending of money he had before then given her, he was able to give her only $35 per month and that thereafter without his knowledge and in spite of his directions and requests, she bought merchandise which she did not use for the family and had it charged to him, his first knowledge of it being when bills were presented to him and that when he denied liability he was insulted by collectors, who threatened to report him to his employer; that when defendant bought articles with his consent, she lied to him about the cost of the purchases, understating them and keeping the difference, which she used for her own purposes; that in April, 1910, she wrote to a friend of plaintiff, asking him to lend her $500 for the reason that she and plaintiff had saved $1100 but that plaintiff's brothers had stolen it from her and then stating that she had spent the money but refused to tell how; that she frequently would not cook meals for him or, if she did, cooked them so that they were not fit to eat and plaintiff had to go to a restaurant to get proper food.

To this defendant filed an answer, admitting the marriage, the birth of the children and that she has the care and custody of them but denies all the other allegations in the petition.

By way of cross-bill defendant states that they were married July 25, 1906, and continued to live together as husband and wife from and after that date until November 7, 1912. Averring that during that time she had faithfully demeaned herself and discharged her duties as the wife of plaintiff, at all times treating him with kindness, she avers that plaintiff had offered her such indignities

as to render her condition intolerable. These indignities, as alleged, are that plaintiff was possessed of a violent and ungovernable temper and had often cursed and abused defendant in the presence and hearing of others; that from about October, 1906, until May 1, 1912, plaintiff compelled defendant to live with him in a dwelling occupied in part by the mother of plaintiff and with full knowledge on the part of plaintiff that his mother had expressed her aversion of and to defendant, and that thereafter the mother of plaintiff continually and habitually harassed and humiliated defendant upon every possible occasion and when defendant was about to become a mother she was taunted with that fact by plaintiff's mother; that all of these acts and conduct of the mother, were had with full knowledge of plaintiff, and when defendant complained to him of the conduct of his mother and pleaded with him to remove her from the house occupied by them, defendant refused to do so, and that when on numerous occasions defendant pleaded with plaintiff for the sake of their unborn child to place her in a more congenial home, he would violently push her from him and command her to cease complaining; that from the date of the marriage and with slight exceptions, plaintiff insisted upon personally buying defendant's wearing apparel and the clothing for their children and refused to entrust her with the purchase of so slight an item as cloth intended for diapers for the children, buying such articles personally and entrusting his mother with like purchases, to the entire disregard of defendant, and in this respect treating her as if she was a paid house servant; that in May, 1911, and shortly before the birth of their youngest child, plaintiff compelled defendant to occompany him to the house of his mother, on which occasion, and in the presence of plaintiff, the mother spat in her face without any cause, and that plaintiff did not express a word of reproach to his mother nor sympathy for defendant; that plaintiff was liberal in the giving of gifts and money to personal friends and relatives, thereby often depriving defendant of the necessaries of life, but was of a miserly and penurious disposition in his conduct toward defend-

ant, and continually and habitually complained to her and harassed her regarding her household expenses and inquired into the minutest details thereof, until, by these acts, defendant became and is a nervous wreck; that about the year 1910, by strict economy and by depriving herself of household necessaries defendant had accumulated as a fund to provide against possible illness the sum of $25; that plaintiff compelled her to give it to him that he might loan it to another person; that on or about that year by reason of gambling losses and debts incurred thereby, plaintiff compelled defendant to write and apply to various persons for the loan of large sums of money; that since May, 1910, plaintiff had refused to give defendant any money for household expenses but compelled her to buy such articles as she needed on credit and had directed the butcher and grocer with whom she was trading to keep their account down to twenty or twenty-one dollars a month, and that thereby defendant was compelled to and did deprive herself of sufficient and nourishing food for herself and children in order that plaintiff might receive the food which his exacting nature demanded; that on or about June 3, 1911, and a few days before the birth of their youngest child, plaintiff threatened to strike defendant, ordered her from their home and on numerous occasions during the marriage, "the exact dates of which are unknown to defendant," plaintiff ordered her to get out of his house and threatened to kill her if she did not obey his command; that plaintiff spent the greater portion of his unemployed time with his mother and with boon companions, returning home for his meals and leaving immediately thereafter, and on these occasions, if his meals were not prepared in time he would curse and abuse defendant in entire disregard of her physical condition, and that in November, 1912, and on other occasions prior thereto, plaintiff, on occasions when their house and home was in a somewhat disordered condition, would bring various persons to their home for the purpose of displaying such condition, to the humiliation of defendant. With the necessary averments as to residence, defendant prays for a divorce and for tthe

care and custody of her minor children and for general relief.

An answer was filed to this cross-bill, denying that plaintiff's mother had any hatred of defendant; that it was defendant's desire that she and plaintiff live in the same house in which his mother lived, a double flat, they occupying the upstairs, plaintiff's mother the downstairs. Averring that plaintiff personally had to buy defendant's and the children's clothing because she was extravagant and bought more than was necessary, and more costly articles than were necessary, or than he could afford out of his salary, he avers that she would not use the money to buy wearing apparel but for other purposes, for which reason plaintiff asked his mother to buy such articles, he being a city fireman on duty five consecutive days and having only one day out of six in which to attend to his own affairs and hence did not have time to make these purchases; that he was allowed one and a half hours to go home twice a day for meals, which made it necessary that his meals be ready on time, he living five miles from the engine house in which he was employed and it taking fifty minutes or an hour to go to meals and back on the street car. Plaintiff finally repeats the charge that defendant was slovenly.

The cause being heard before the court, plaintiff was granted a decree of divorce from defendant, the defendant's crossbill was dismissed, she was awarded the general care and custody and control of the children, plaintiff to have the special custody of them on certain days not named in the decree; and $27.50 a month was awarded defendant for the maintenance and support of these children.

Filing a motion for a new trial, which was overruled, defendant has duly perfected her appeal to our court.

Learned counsel for respondent contend that the appeal should be dismissed, calling the case "a double barrelled case;" that we have here two separate actions, one by plaintiff and one by defendant, and that the affidavit for an appeal not being specific and definite "but the general affidavit," does not bring up the two cases. There

is nothing whatever in this proposition. The affidavit for an appeal is the one in form universally followed in our practice in like judgments. The only case from our courts cited by counsel for his position is Garland v. Smith, 127 Mo. 567, 28 S. W. 191, 29 S. W. 836, and it in no manner supports him.

A careful and patient reading of all the evidence in the cause compels us to say that we cannot sustain the action of the learned trial court in this case.

It is argued that the evidence being conflicting, we are bound by the finding of the trial court.

We have held in many cases, as has the Supreme Court and the other Courts of Appeals, that in an action for divorce, as in all actions that partake of the nature of suits in equity, we pay great deference to the conclusion arrived at by the trial court where the evidence is conflicting. In all such cases, however, it has been uniformerly held that it is the duty of the appellate court to review the evidence and determine the case on its own conclusions on that evidence, having in mind, however, the rule above stated. We have always recognized it as a fact that the trial court has a great advantage over the appellate court in determining on the weight of evidence when conflicting. But our court, as well as the Supreme Court and the other appellate courts have not felt bound, even in reviewing the evidence, by the view taken of that by the trial court, if that review results in conclusion different from that arrived at by the trial court. See, among many like cases, Parker v. Roberts, 116 Mo. 657, 22 S. W. 914; Cherry v. Cherry, 258 Mo. 391, 1. c. 403, 167 S. W. 539; (approving the Torlotting and Barth cases, infra); Torlotting v. Torlotting, 82 Mo. App. 192; Barth v. Barth, 168 Mo. App. 423, 151 S. W. 769; Allfree v. Allfree, 175 Mo. App. 344, 162 S. W. 650; Gedwell v. Gedwell, 184 Mo. App. 496, 170 S. W. 421. Briefly, cases of this kind address themselves to the conscience of the court. This applies equally to the appellate as to the trial court.

We have set out practically *verbatim* the petition, crossbill and answer to the latter. Taking up the mat-

ters which plaintiff charges as indignities suffered by him at the hands of his wife, and which, it is averred, were such as to render his condition intolerable, and even assuming that plaintiff proved all of them by substantial testimony, we do not think as to most of them that they constitute indignities within our statute. As has been said at an early date by our Supreme Court in Hooper v. Hooper, 19 Mo. 355. l. c. 357, "It is impossible to lay down any rules that will apply to all cases, in determining what indignities are grounds of divorce, because they render the condition of the injured party intolerable. . . . The Legislature chose to leave the subject at large, and by the general words employed, evidently designed to leave each case to be determined according to its own peculiar circumstances." The first part of this is quoted approvingly in Kempf v. Kempf, 34 Mo. 211, l. c. 214. Our own court has said in Holschbach v. Holschbach, 134 Mo. App. 247, l. c. 257, 114 S. W. 1035, and citing Goodman v. Goodman, 80 Mo. App. 274, "For an indignity to be intolerable in the statutory sense it must amount to a species of mental cruelty." Tested by this definition, and without reference to the fact that all of the facts plaintiff relies on for proof of these so-called indignities, rests mainly on his own testimony and is contradicted by the testimony of defendant and her witnesses, we cannot hold that the acts which plaintiff charges as indignities are of such a character as to amount to a species of mental cruelty, or of such a character as would justify a husband, here apparently a young man in the full vigor of life, in abandoning his wife and then have their marital relation sundered. Moreover, as said, the truth of these alleged acts rests for the most part on the uncorroborated testimony of plaintiff, and it has uniformly been held in divorce that one is rarely granted on the uncorroborated evidence of one of the parties. [Gruner v. Gruner, 183 Mo. App. 157, l. c. 171, 165 S. W. 865.] Plaintiff himself testifies that his wife was a good housekeeper and that they got along until 1910, when he found out that his wife squandered his money and put him in

debt.   With this admission of the plaintiff it would be incumbent upon him to prove that the acts of which he complains occurred between that time and November 7, 1912, when he left her.   In this view of the case, it is very hard to determine, it certainly does not clearly appear, how many of the alleged acts of the wife, of which complaint is made, occurred prior to 1910.   The plaintiff has further testified, when asked when he and his wife finally separated, that it was on the 7th of November (1912).   Asked what was the direct cause of the separation, he said: "Well, failing to keep her house and herself and children clean."   Then this appears, counsel for defendant cross-examining plaintiff:

"Q.   There was nothing particularly wrong then? A.   No, sir.

Q.   You had nothing but the kindest feelings towards your wife and children?   A.   Yes, sir.

Q.   How long previous to the 7th of November had you contemplated bringing this divorce suit?   A.   Why, about a week before."

He swore to his petition November 4, filing it November 9.

So plaintiff gives two causes for his desertion of his wife.   First, finding out that his wife squandered his money and ran him in debt; then, that she failed to keep her house and herself and her children clean.

With this distinct limitation of his ground of complaint, made by plaintiff himself, the testimony he produced should have covered the last two years of their married life.   But it does not.   Thus, his mother, who lived in the same flat but on the lower floor, and who testified very positively as to the wife's lack of proper care of the cleanliness of herself and children and house, says she was not in the flat of her son and daughter-in-law more than four or five times, although they had lived there from November, 1906, to the first of May, 1912, and on cross-examination she repeated that in the six years she had been in their flat only four or five times.   When she had gone there and seen the condition to which she testified, no where appears.   So it is with the majority of the

witnesses testifying for plaintiff as to this matter. More-over, most of them were the relatives of plaintiff, and it clearly appears that there was a serious break in friend-ly relations between them and defendant. When and for what cause, does not appear. But it is sufficient to say of it that it does not fix the time within the two years of which plaintiff complains. The couple moved from the flat above plaintiff's mother in May, 1912, and from then on until the separation they lived in another flat.

The weight of the testimony for defendant by dis-interested witnesses is decidedly against that of plaintiff as to the personal habits of defendant both as to herself, her house and her children. In point of fact, in our opin-ion, it entirely overcomes that of plaintiff on these mat-ters.

It may be stated here that while plaintiff charges de-fendant with neglect and lack of proper attention to her "children," there is no testimony even by plaintiff or any of his witnesses, that this was so as to Bernice; all that was given on this relates to Walter, the boy.

When we look into the testimony of plaintiff on the charge that defendant wasted his money and run him in debt, we find it rests entirely upon plaintiff's own testi-mony, that testimony denied by defendant and not only un-corroborated by any one but contradicted by all the evi-dence going to show the mode of life of defendant, her scant supply of even the most necessary clothes for herself and children and for the beds; she wearing dresses that lady witnesses said were of the cheapest kind, having but two or three suits of undergarments for her children; two sheets for the bed; wearing a nightgown herself for lack of the usual undergarment.

Nor is there a particle of testimony to show that she squandered her husband's money or ran him in debt. In brief, we hold that plaintiff has entirely failed to establish his case on those points upon which he has himself rested it by his testimony.

When we examine that relating to other charges in the petition, we find it unsupported by any corroborated testimony. Particularly so with the charge that in April,

1910, the wife wrote to a friend of the husband asking him to lend her $500 for the reason that she and plaintiff had saved $1100 but that the money had been stolen from her by plaintiff's brothers and that she then stated that she had spent the money but would not tell how. This rests practically on his statement and on the testimony of some of his relatives that she claimed that eleven or fifteen hundred dollars had been stolen from them, and is explained by her as a story made up by her at his instance; that she had written this letter to a friend at the direction of her husband, in his presence, and that he had mailed it, and that the story about the theft of the money was made up at his dictation, to explain the absence of any money. There is not a word to corroborate plaintiff's testimony that until 1910 he gave his wife $80 a month. The wife denies it and the conditions surrounding them fail to sustain it. There are no facts in evidence even tending to prove that the wife ever had command of any such sum.

His complaint about insufficient food and poor cooking, and that he was obliged to go to restaurants to procure proper food, is not only not sustained but disproven by the testimony of every disinterested witness who testified. In short every one of the allegations of these so-called indignities are unsustained by substantial testimony, where not flatly contradicted. Passing the question of these being such indignities as the law recognizes and as the courts will consider, we hold, on a careful reading of the testimony that they are not sustained by the weight of the evidence in the case and that plaintiff was not and is not entitled to a divorce. Our reading of the testimony satisfies us that all there is in plaintiff's case is, that for some reason he became tired of his wife and endeavored on trivial charges to divorce her.

On the other hand, our conclusion, upon reading the testimony, is that the wife, appellant here, is the injured and innocent party. This couple were married in 1906, the defendant then a young girl eigteen years of age. A son was born to them a year or so after their marriage, and at the time of the trial, which was commenced on February 4, 1913, this son was something over five years

of age. Another child, a daughter, was born to them in the late spring or early summer of 1911, and according to plaintiff's own testimony it appears that the matters of which plaintiff complains date from about that time. It is rather suggestive that in his petition in this case plaintiff makes no application for the custody of these children, while, as will be seen by her cross-bill, defendant prays that she be awarded the care and custody of both of them, and it is a little remarkable that the learned trial court, while evidently finding that defendant did not give her children proper care and suffered them to be untidy and dirty, awarded her the general custody of both of them.

We have seen that the charges of plaintiff as to his wife's habits as a housekeeper and mother and wife are not sustained.

As before noted plaintiff testified that his wife had been a good housekeeper and that they got along happily together until 1910, when he found out that his wife had squandered his money and run him into debt, further testifying that the direct cause of the separation was the failure of his wife to keep her house and herself and "children" clean. The plaintiff leaving his wife on November 7, 1912, carries these two years back to the first part of November, 1910. The little girl, Bernice, being sixteen months old when the petition was filed, November 9, 1912, would place her birth at about July, 1911. So that the alleged carelessness and negligence and untidiness of defendant, according to plaintiff's testimony, must have occurred during the period of her pregnancy and when she was caring for a young baby. Furnishing her with no hired help, knowing that she had no regular help, according to his own testimony, the plaintiff resented the failure of his wife, during this trying period, to keep herself and her house and her son, then a little over four years of age, in the condition that plaintiff appears to have demanded, and cook and prepare his meals. According to the testimony of outside witnesses—disinterested witnesses—during this critical trying period for the wife about to become a mother, and directly afterwards, plain-

tiff treated her in such a way that, to our minds, savors of cruelty. The little boy, Walter, during the period covered by plaintiff's charges of suffering him to become and remain untidy, was in his third, fourth and fifth years. The testimony is, he was as clean as other boys situated as he. No one could expect a mother, however careful, to keep a boy of that age, confined to four rooms in a flat, with a back yard or the street to play in, immaculately clean.

The testimony on defendant's part tends to show that the extravagant spender was the plaintiff. It is in evidence and uncontradicted, that plaintiff had frequently gone across the river to Granite City or Venice and engaged in "shooting craps;" that he had gone over there for that purpose when he was off duty; on one day he had gone twice. He was convivial, not intemperate nor a drunkard, but drinking and spending his money with his friends. On one occasion, when a young girl had been staying with the wife all night, as this girl testifies, plaintiff came home about two o'clock in the morning and when his wife asked him where he had been, he said: "Oh, I can't tell it. I was in such a filthy place that I had to hide my diamond ring." A significant answer; significant as to his habits and significant as to his manner of personal adornment. It is in evidence that he had given quite valuable presents to a number of his acquaintances while all this time the evidence is overwhelming that his wife had the bare necessities of life for herself and children and was dressed so poorly that several of the witnesses, disinterested parties, said that they would not like to go to church in such a dress as she wore. There is evidence from disinterested witnesses that his conduct at home was surly; that he was cross with his wife and the children; that she met him on many occasions with the children at the street car as he was coming home, and when at home she attempted to caress him he repelled her caresses and never returned them. In short, according to the testimony in the case he was one of those men who was "a good fellow among the boys," but surly, niggardly, exacting and overbearing at home [Allfree v. Allfree,

supra, l. c. 347.] He told his wife on several occasions that if she did not do this or that he would "knock her block off." On another occasion when the children were sick, he told her that if anything happened to them she would have to "hike it," saying to persons to whom he was talking that if that happened they would "see a little girl going down the avenue with a bundle under her arm." He cursed her on several occasions and used vulgar and profane language to her, not only when they were alone but in the presence of others. On one occasion, angry at a bill of $2.50 being presented to him, he ordered his wife out of the house. While she was nursing and caring for her sick baby, her husband compelled her to do the baking, he refusing to eat baker's bread.

Even the manner of instituting this action is, to say the least, peculiar and suspicious. Without the slightest intimation to his wife, so far as the testimony shows, of any intention to seek a separation, on November 4, 1912, plaintiff went to an attorney and had this petition drawn up and swore to it on that day. On the 5th and 6th he lived with his wife as usual, and on the 7th of November he went home, went up to their flat, called in a sister of his wife, having brought her brother along with him, and calling them into the room, looked at his wife, who had the baby in her arms, and said: "This is going to be a surprise to you. Our home is going to be broken up. You can stay here if you want to. I don't care what you do." On the 9th of that month he filed the petition in this case.

This was the conduct of the plaintiff immediately before or a short time before he left his wife.

In brief, the weight of the testimony is that plaintiff was the offender and defendant the victim of his ill-temper and ill-usage.

On this testimony we think the learned trial court erred in dismissing defendant's cross-bill. On the showing here made on the evidence in this record the defendant is entitled to the divorce and to a suitable allowance for maintenance of herself and children.

The judgment of the circuit court is reversed and the cause remanded with directions to the trial court to dis-

miss plaintiff's petition and render judgment in favor of defendant on her cross-bill, awarding her a divorce, giving her the custody of the children, awarding her for alimony and support and maintenance of her children $50 per month, subject to the subsequent control of the circuit court, as provided by law, as to custody of the children and amount of the allowance if a change occurs in the situation of the parties, and taxing the costs of this proceeding heretofore incurred in the circuit court and in our court against plaintiff as well as costs hereafter incurred. *Nortoni* and *Allen, JJ.,* concur.