MARY E. ESWORTHY, RESPONDENT, v. CHARLES M. ESWORTHY, APPELLANT.*

Kansas City Court of Appeals. December 17, 1928.

*Corpus Juris-Cyc References: Divorce, 19CJ, section 344, p. 131, n. 97; section 367, p. 142, n. 52; section 473, p. 192, n. 9; section 479, p. 194, n. 34.

*George W. Bailey* and *Vane C. Thurlo* for respondent.

*Paul Van Osdol* for appellant.

ARNOLD, J.—This is an appeal from a decree of divorce carrying alimony, instituted and tried in the circuit court of Linn county. The petition alleges plaintiff and defendant were married on February 21, 1890, and that the parties lived together as husband and wife from said date until the —— day of ——, 1924; "that during all that time plaintiff faithfully demeaned herself, and discharged all her duties as the wife of defendant, and at all times treated him with kindness and affection; but said defendant, wholly disregarding his duties as the husband of plaintiff, has been guilty of such cruel and barbarous treatment as to endanger the life of this plaintiff, in that plaintiff was forced by her ill health to undergo a serious surgical operation, during the year 1926, and that the defendant well knowing this, has three times since said operation attacked the plaintiff and struck, beat, slapped and choked this plaintiff without any provocation, and that such attacks and results have resulted in grave danger to this plaintiff; and that the defendant has offered this plaintiff such indignities as to render her condition in life intolerable, in this, that the defendant has on many occasions cursed and abused the plaintiff without cause, and that the defendant has refused, and does refuse, to contribute to the support of the plaintiff, and refuses to furnish her the necessities of life. . . . Plaintiff further states that defendant has an income of $225 per month, and that plaintiff is wholly without means of support, and for the prosecution of this suit."

The prayer is for absolute divorce "and that the court will adjudge to her out of the property of the said defendant, such support and maintenance, and for such time as the nature of the case and the circumstances of the parties may require; and that, if necessary, defendant may be compelled to give security for such maintenance; and that the court will make such further orders and judgments from time to time, touching the same, as to the court shall seem meet and proper."

The answer admits the marriage of plaintiff and defendant as alleged in the petition and makes general denial as to each and every other allegation thereof. No cross-bill was filed. The decree was for plaintiff, the court finding her to be entitled to the relief prayed in her petition and "restoring her to all the rights and privileges of an unmarried person." Further the decree is as follows:

"And it is further ordered, adjudged and decreed by the court that the defendant pay to plaintiff by way of alimony the sum of seventy-five dollars ($75) per month the first of each month from the date of this decree, thirty dollars ($30) of which shall be by the plaintiff each month applied on certain promissory notes signed by plaintiff and defendant and secured by a deed of trust on the real estate of plaintiff; and it is further ordered, adjudged and decreed by the court that defendant pay to plaintiff as attorney's fees the sum of one hundred dollars ($100), and the costs therein, and that execution issue therefor."

Defendant's motion for a new trial was overruled and he has appealed.

While the grounds for divorce are statutory yet a case of this character is to be treated on appeal as an equity case. It is our duty, therefore, to read the entire record, to try the case *de novo* and enter such judgment therein as should have been rendered in the court below. In such case the findings of the trial court are not binding on us but, under the decisions in this State, we defer largely to the findings of that court. The reason for the rule is that the trial court hears the testimony of the witnesses and is thereby in better position to guage their testimony than are we who must be confined to the cold type of the record. [Donaldson v. Donaldson, 249 Mo. 228, 155 S. W. 791; Long v. Long, 171 Mo. App. 202, 156 S. W. 487; Barth v. Barth, 168 Mo. App. 423, 151 S. W. 769; Elder v. Elder, 186 S. W. 530.] As stated above there was no cross-bill and defendant seeks no divorce. It was held in Elder v. Elder, supra, that in this situation the only point for our consideration is plaintiff's right to a divorce under the pleadings and evidence.

The case was vigorously fought in the court below and the record shows there was much acrimony displayed by both counsel and litigants.

It is noted the petition charges cruel and barbarous treatment, such as to endanger the life of plaintiff—"in that plaintiff was forced by her ill health to undergo a serious surgical operation, . . . and that defendant well knowing this, has three times since said operation attacked the plaintiff and struck, beat, slapped and choked this plaintiff without any provocation, and that such attacks and assaults have resulted in grave danger to this plaintiff . . ."

The petition also contains other specific allegations of indignities, as follows: "And that the defendant has offered this plaintiff such indignities as to render her condition in life intolerable, in this, that the defendant has on many occasions cursed and abused the plaintiff without cause, and that the defendant has refused and does refuse to contribute to the support of the plaintiff, and refuses to furnish her the necessities of life."

In support of the allegations of the petition plaintiff, testifying in her own behalf, stated: She and defendant were married at Macon, Missouri, on February 21, 1890, but at said time she was living at Brookfield, Missouri; that she had been earning her living by sewing and that she kept house; that defendant had no property at the time—"only the clothes he had on his back and barely one change." That plaintiff owned all the property and household goods; that she had previously been married and had one daughter (now married) by a former husband; that defendant came and lived in plaintiff's house after their said marriage; that everything was agreeable for several years; that defendant accumulated something in that time and became a member of the co-operative store formed by railroad and laboring people; that about this time defendant was not doing his part toward maintaining the family; that plaintiff was then keeping up her work but not so steady as formerly because of ill health; that defendant began the assaults upon her "about eight years ago." That on the occasion of the first assault defendant beat her "in the house," then dragged her out of the house and called to a neighbor "to come out and look at me."

Plaintiff testified that at the time they were living in a house "on the south side" which she had purchased on payments of $10 per month; that one of her daughters died leaving some insurance payable to plaintiff, out of which plaintiff paid $1700 on the property and defendant paid $500, the title being placed in plaintiff for the reason defendant did not want any property in his name at that time; that future payments were to be made at $30 per month. That about that time plaintiff and defendant were somewhat estranged, defendant was not supporting her; that prior to the payments on the house above detailed they had been paying rent and defendant promised to keep up the monthly payments and they moved into the house so purchased; that for eighteen months thereafter defendant gave

plaintiff his pay checks; that she paid the household expenses, including expense of moving; that she made the $30 payment upon the house every month and gave defendant $25 to $45 per month for his living expenses on the road, he being an engineer; that this was agreed between the parties. After the eighteen months defendant kept his own pay check; that thereafter he paid the grocery bills and for awhile kept up the monthly payments on the house; that five years ago plaintiff and defendant ceased to live together as husband and wife although they lived in the same building, each occupying a separate room; that plaintiff tried to keep roomers but defendant insulted them and they left. That about this time plaintiff required a surgical operation, that it was performed and that it was after the operation the first beating occurred; that on the occasion of this beating her daughter by a former husband, Mrs. Weiner, and her daughter Mary were visiting plaintiff; that Mrs. Weiner took the vacuum cleaner and mop and started to clean the house and defendant commenced to clean the hall; that a wordy combat arose in which all three took part; plaintiff snapped off the electric button so defendant could not operate the vacuum cleaner, defendant shoved her away, connected the sweeper, plaintiff again disconnected it and defendant struck her; that three or four days later the second combat occurred, on a Saturday night. Plaintiff stated she and Mrs. Weiner came in after twelve o'clock at night from calling upon a neighbor and had the electric lights burning; defendant came in off his run about that time and complained about the lights burning; began fussing with Mrs. Weiner about it and threatened to pull the fuse. Defendant went down stairs but Mrs. Weiner went ahead of him and tried to get hold of the telephone to call the police for she had told defendant "if he ever struck me again she would have him arrested;" that when she tried to get the telephone he jerked it off the wall and Mrs. Weiner grabbed it and threw it at him, whereupon defendant hit Mrs. Weiner, knocked her into the parlor and threw the stand after her; that plaintiff and Mary Weiner took Mrs. Weiner's part and that defendant struck plaintiff with his fist, knocking her against the mantel and hurting her arm. Plaintiff testified this injury to her arm produced another cancer which required another operation; that she made many trips to Kansas City because of the treatments for cancer, paying her own way; that while engineer's wives are entitled to passes, defendant would not allow her to have one; that plaintiff paid her doctor bills in Kansas City. Plaintiff testified defendant had bought a coat for another woman after the separation. Plaintiff was operated on at the Mayos, Rochester, Minn., for cancer and stated the cancer was the result of beating she had received at the hands of defendant; defendant did not go to Rochester with her but Mrs. Weiner did.

On cross-examination, plaintiff testified defendant did not complain to her about the lights on the occasion of the first fight; that she did not sign an affidavit for her husband's arrest; that he was arrested and on trial was acquitted; that she owns the furniture in the house and it was not bought with defendant's check; that very little, if anything, in the house came out of defendant's checks; that she does not know if defendant has any money or funds. On re-direct examination plaintiff stated that when she and defendant were married he could not read, nor write his own name; that she and her two daughters taught him to read and write; that defendant had changed the beneficiary in his insurance and pension from plaintiff to his daughter; that their daughter Nellie was ill and had to be taken to Kansas City for treatment, at a cost of $7 to $57 per week and that this was paid by defendant. She stated defendant got into difficulty with engineer Bryan and hit him with a salt cellar and that he paid Bryan's doctor bill at the suggestion of the railroad company, together with a fine and costs.

Dr. C. E. Jenkins, testifying for plaintiff, stated he had treated her after the alleged beating in July; that when he examined her she was nervous and had black and blue places on her arms and at one time, there was some discoloration on the side of her face; that he saw nothing on her face which resembled finger marks; that her arm was bruised; witness knew of plaintiff going to Kansas City for several years; stated her physical condition is not good. She had a cancer in her mouth removed by radium; a cancer in the left breast removed by a surgical operation and at the time of the trial she had a cancer in the other breast; that this latter one probably came from the one in the other breast which was removed.

On cross-examination, Dr. Jenkins said he would not testify the cancers were due to blows; could not say the bruises on the arm were prior or subsequent to the trial of defendant for disturbing the peace; the marks could have been caused by gripping the arm in a scuffle and not necessarily by a blow, but that the discoloration on the neck and chest were evidently due to a blow of some kind but he would not say just what; that they could have been caused by a blow. The witness stated he had dressed defendant at one time for an incised wound on the head about an inch and a half to two inches long, through the skin; a small blood vessel had been cut; he had blood over him.

Mrs. Nora Weiner, testifying for plaintiff, stated she went to the city attorney West and complained and that defendant was arrested, tried and acquitted; that plaintiff had nothing to do with filing the charge. This witness corroborated plaintiff in her version of the fight over the lights; stated she struck defendant with the telephone receiver after he had thrown the telephone stand at her; that she was protecting her mother; that defendant had hit plaintiff; that

witness's nose was bleeding from the melee when she was taken by the policeman to Mr. West; that defendant had gone downstairs to pull the light fuse and she went down after him, that her daughter and mother followed and the row began as detailed.

Mrs. Eva Gunter testified to a certain conversation between plaintiff and one Mrs. Everhart about a coat alleged to have been purchased by defendant for Mrs. Everhart—not in the presence of defendant. Objection to this testimony was overruled. Witness testified it was said in that conversation that the coat cost close to $50 and that defendant paid for it. Witness did not know what became of the coat.

Defendant testified he is a railroad engineer and had served as fireman and engineer for a little over thirty years; that after he and plaintiff were married they bought, first, the property at 511 West Helm street in Brookfield; that he then was employed in the round house; the property was cheap; they bought it for $600 making rent payments and getting along very fine. But in the meantime plaintiff's eldest daughter got married, became ill, came home and died there. Plaintiff got some life insurance at her daughter's death; that plaintiff would no longer live in that house and moved onto Main street, paying $15 a month rent; found they could not rent the Helm street property and so moved back there; put $2500 improvements on the property. In the meantime from her insurance money plaintiff bought a horse and buggy for $300 and paid $450 for a piano; that the first husband of plaintiff's second daughter, now Mrs. Weiner, was a barber named Goff; that $800 of plaintiff's insurance money went to buy barber's fixtures for Goff. Sometime after this the property at 511 West Helm street was sold for $1500; plaintiff had insisted that it be sold; that plaintiff and defendant then broke up housekeeping and defendant roomed and boarded around Brookfield; plaintiff was not there much, not over two months at a time; she went different places; would come home a day or two, get another pass "and hike out for some place else;" this continued for more than a year. After plaintiff's daughter separated from her husband, plaintiff and the daughter came to Brookfield; plaintiff and defendant rented a house, bought new furniture and went to housekeeping again; the furniture was bought with money witness had placed in the bank in plaintiff's name and which she checked out; the parties lived in that rented house perhaps a year, then rented a big house on North Main street with the intention of keeping roomers. In buying the property involved in this controversy, about $2200 was paid down, of which defendant supplied; $500; witness would have paid $800 but had just loaned $300 to Weiner and his wife; $1500 of the $2200 paid on the property was proceeds of the sale of the Helm street property. Plaintiff paid from defendant's wages the $30 a month until November, 1920, when she went to Texas on a visit for

two months; defendant then began cashing his own checks and made the payments for awhile; then the doctor bills for plaintiff at Kansas City and Rochester became too heavy for him and he ceased making payments on the place; the property was placed in plaintiff's name; in addition to the payments defendant built a new flue at an expense of $180; put a new floor in the basement, $80; a new fire bowl in the furnace $72.50; a new furnace room $35, and paid the taxes which ran over $100 per year. Defendant explained the matter of the purchase of a coat for Mrs. Everhart by saying that in addition to his work on the railroad, he sold clothing on commission; that he bought the coat for Mrs. Everhart at her request and turned it over to her, but as she failed to pay the $45 for it, it was taken away from her and turned over to his and plaintiff's daughter in Kansas who now has it.

Explaining the circumstances of the first alleged assault, defendant testified:

"Now we will start in on the assault which she claims when we lived up neighbors to Mrs. Harris; I was sitting in an arm chair quite a bit bigger than this. She was mad; she made a dive at me with the butcher knife; don't laugh, you done it, and I finally and in order to get loose from her, I did take her out doors in the yard and let her loose. I was only doing it for my own protection."

Defendant relates a circumstance of plaintiff throwing a glass tumbler at him, and as to the story of the vacuum cleaner defendant testified as follows:

"Then the time of the vacuum cleaner deal, it is the truth nobody had never cleaned the hall but me. Mrs. Weiner was only in the hall walking, she wasn't doing anything. So I connected up the vacuum cleaner and Mrs. Esworthy jerked it loose and I connected it up again and she jerked it out again, and I turned around and she had that (a hammer) laying right inside of her door, she grabbed that and I don't think it missed the top of my head a half an inch. I reached down to get the hammer, I says, now there may be a time I want that hammer in court."

As to the controversy growing out of the electric light incident, defendant explained as follows:

"Q. Tell his Honor about that incident when you were arrested. A. That happened after this hammer deal. Now at this time Mrs. Weiner and I were friends, but the day before they had me arrested that night, Mrs. Weiner was on the front porch when I started to work. I asked her when she was going home. She says, 'the less you have to say to me the longer I will get to stay here.' She meant her and her mother was about to blow up because she was friendly with me. That night when I come home—

"Q. About what time did you come home? A. About 12:30 or 12:45, Mrs. Weiner done just as she said she did. She put her light

out. Mrs. Esworthy didn't go to bed, she was laying on the bed reading a novel. I says, 'don't you think it is time for you to put your light out and go to bed and save the expense?' I went on in the room and I come back and asked her the same thing, and after I asked her the second time she goes out of her room and goes in the room where Mrs. Weiner was, and Mrs. Esworthy come on back, and I asked her the third time to turn her light out and she never answered me. So I waited a little while longer, I says 'I will have to put a stop to this, I will go down and pull the fuse plug out,' and here they come after me. Mrs. Weiner says 'I will call the police.' I picked up the telephone and I says 'this is my telephone, I pay for it.' Mrs. Weiner grabbed the telephone and lurched back on it and tore it loose from the wall, and I let go at the same time and then she throwed it at me, and then the telephone was on the floor, right down at my feet, and then she grabbed the stool and made a rush at me; in grabbing the stool she cut a big place in my wrist. I got that away from her and they started to hallo murder and fire, and I set down in a chair and started to laughing and Mrs. Esworthy urged Mrs. Weiner to go get the law.''

Defendant stated that at the time Dr. Jenkins dressed the wound on his head plaintiff had struck him with a plate. This was un-refuted. Defendant testified he was ready and willing to pay for plaintiff's necessities if she will tell him what she wants, but this she refuses to do; that he has refused her credit because of her unfair treatment of him; that he is still paying her obligations. His testimony was not changed materially on cross-examination. Plaintiff was recalled to the stand in rebuttal but no substantial change from her examination in chief appears. Other evidence was introduced in attempted corroboration but we discover therein no material difference from that given by the parties hereto. The decree of the court was as above stated.

One cannot read the evidence in this case without being impressed with the fact that both parties to this action are equally culpable. It is evident that much of the bickerings and quarrels originated in trivial incidents and that one of the parties was as ready to fight as the other. It seems clear that the presence of plaintiff's daughter, Mrs. Weiner, in the home of the litigants was, to say the least, not conducive to harmony; but rather was provocative of an occasional ''rough house,'' since she joined in and at times provoked the recurring combats. While the petition alleges indignities, such being specially set out, these charges are based upon alleged assaults of defendant upon plaintiff. There is testimony tending to prove other facts which might be classed as indignities, but which are not charged in the petition. An allegation is made that defendant does not contribute to the support of plaintiff but this charge, if proved, could not be accepted as an indignity, though it would be a proper basis

of a suit for separate maintenance. The same may be said of other testimony which went into the record without objection and which we cannot accept as proving the allegations of the petition. For instance, there is the incident of the purchase of a coat for a woman other than defendant's wife. We see in this circumstance, if unexplained, a great indignity and one which probably would support the decree, but in the light of defendant's explanation which stands undisputed, it cannot be so accepted.

In a divorce case the party seeking the divorce must establish by a clear preponderance of the evidence that he or she is the innocent and injured party. It has been held that where the evidence does not preponderate in favor of the plaintiff, the decree should be denied. [Long v. Long, 171 Mo. App. 202, 156 S. W. 487; Torlotting v. Torlotting, 82 Mo. App. 192; Barth v. Barth, 168 Mo. App. 423, 151 S. W. 769; Cherry v. Cherry, 258 Mo. 391, 167 S. W. 539; Elder v. Elder, 186 S. W. 530.] In the case last cited it was held that where a defendant does not seek divorce, the only question to be decided is plaintiff's right thereto. It has also been held on appeal in divorce cases that the findings of the trial court are not binding upon the appellate court but upon a hearing *de novo,* the appellate court may rejects such findings. [Donaldson v. Donaldson, 249 Mo. 228, 155 S. W. 791; Friedmeyer v. Friedmeyer, 194 S. W. 746; Elder v. Elder, supra.] In the light of all the evidence in the record before us we must hold the plaintiff has failed to prove she was the innocent and injured party. Under this holding it is deemed unnecessary to discuss the question of alimony.

The judgment is reversed. *Bland, J.,* concurs; *Trimble, P. J.,* absent.